SCHNURR v. DETROIT UNITED RAILWAY.

1. APPEAL AND ERROR—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

Where, in an action against a street railway company for personal injuries, plaintiff had verdict and judgment, on error, the evidence on the question of plaintiff's contributory negligence must be considered in the light most favorable to plaintiff.

2. STREET RAILWAYS — NEGLIGENCE — CONTRIBUTORY NEGLIGENCE— DIRECTED VERDICT.

Where plaintiff, a passenger on a north-bound car, after alighting, waited until the car had gone past about 75 feet, when the motorman of a slowly-moving car from the south apparently motioned her to cross the tracks to the west, which she started to do, but, on reaching the strip between the tracks, saw a car approaching rapidly from the north, when she became confused, hesitated, and was struck, it cannot be said, as a matter of law, that she was guilty of contributory negligence.

3. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—SUDDEN PERIL.

One put suddenly in peril is not required imperatively to do that which, after the peril is ended, it is seen he might have done and escaped; the law making allowance for the fright and lack of coolness of judgment incident to such peril.

4. STREET RAILWAYS—NEGLIGENCE IN OPERATION—RATE OF SPEED —DIRECTED VERDICT.

In view of the fact that street cars have no monopoly of city streets, but must be operated with regard to the rights therein of pedestrians, where a motorman ran his car at such speed, while passing another car from which passengers had just alighted at a street intersection, that his car went more than 150 feet after striking a pedestrian before it was stopped, the question of his negligence was one for the jury.

5. NEGLIGENCE — GROSS NEGLIGENCE NOT APPLICABLE WHERE NO CONTRIBUTORY NEGLIGENCE.

The doctrine of after-discovered negligence has no ap-

On injury to street car passenger who, upon alighting, passes around the car and is struck by car on another track, see notes 4 L. R. A. (N. S.) 729; 21 L. R. A. (N. S.) 887.

On excessiveness of verdicts in actions for personal injuries other than death, see note in L. R. A. 1915F, 30.

plication to a case where the plaintiff is not guilty of contributory negligence.

6. APPEAL AND ERROR—QUESTIONS FOR REVIEW.
The statement by appellant's counsel, in his oral argument, that a new trial was not asked for, renders it unnecessary for the Supreme Court to consider the errors assigned on the instruction as to after-discovered negligence, or the admission or rejection of testimony, or the refusal of defendant's requests to charge, other than that for a directed verdict, because a finding that there was error in any of such respects could but result in a new trial.

7. DAMAGES—EXCESSIVE JUDGMENT—NEW TRIAL.
Where there was evidence that as a result of being struck by defendant's street car plaintiff, a nurse 32 years of age, sustained a double fracture of the leg, resulting in its being permanently shortened, that she submitted to several operations and spent considerable sums of money for nursing, hospital, and doctors' bills, that she suffered intense pain for a long period of time, and that her earning capacity was seriously impaired, it cannot be said that a judgment for $12,000 was excessive.

Error to Wayne; Webster (Clyde I.), J. Submitted January 16, 1923. (Docket No. 31.) Decided March 22, 1923. Rehearing denied June 4, 1923.

Case by Febronia Schnurr against the Detroit United Railway for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*William G. Fitzpatrick* (*Frederic T. Harward,* of counsel), for appellant.

*Clarence P. Milligan,* for appellee.

SHARPE, J. Plaintiff alighted from a north-bound passenger car on Hamilton avenue in the city of Detroit at the usual stopping place just before it reached Atkinson avenue. Her intention was to cross to the west side of the street. She was struck and severely

injured by a car on the west track, going southward. She had verdict and judgment. We consider the assignments of error discussed by counsel.

1. Plaintiff's Contributory Negligence. In determining this question, the evidence must be considered in the light most favorable to plaintiff. She testified that a car was following quite closely from the south; that when she alighted she waited for the car on which she had ridden to pull out; that when it had gone about 75 feet she looked to the motorman on the approaching car, then about 25 feet distant and moving slowly; that he motioned for her to cross; that she then crossed the track on the east side of the street and when between the two tracks she—

"looked north and saw a car coming down the line at a terrific speed. It was between 100 and 125 feet away when I first saw it. I thought sure just as soon as I would stop there and they would see me that they —and put up my hands, to see that I was in danger there, both coming with that speed, I thought sure they would stop, but they didn't. * * * I hesitated for about two seconds, thinking that they would stop. I put up my hand. I did not say 'stop' or anything, I just got excited and I thought they would stop by my signal. I was facing west at that time. The motorman did not slack up at all; he did not slow down at all; had he slowed down I would have made it with comfort. * * * I turned right back facing the east. * * * I thought I could make it the other way, but I could not. * * * The car, the north-bound car was still just moving, I should judge— I should think it was just about coming to a stop there."

On redirect-examination she was asked why she "did not go across in front of his car that was coming down." She answered:

"A. Because it was coming at such a terrible speed, that I was afraid—I was not afraid at the time of crossing, only I thought I would wait and give him a

chance to slow down a little bit, for I knew he had time to slow down.

"*Q.* Did you expect that he would slow down as you stood there?

"*A.* Yes, sir, I did; that is why I put my hand out, thinking he would.

"*Q.* What was your best judgment at that time as to what to do?

"*A.* To stop and wait for him to slow down."

She was between the tracks when the south-bound car struck her.

If the plaintiff waited until the car from which she had alighted had gone on a distance of 75 feet or more and then treated the apparent signal of the motorman on the car approaching from the south as an indication that she might safely cross, it cannot be said as a matter of law that she was guilty of negligence in proceeding to do so. She then found herself on the narrow strip between the two tracks, a place where a man might perhaps stand in safety but one in which we think no prudent person would willingly do so. Cars were approaching from both directions. Did she act with prudence? It is urged that she could have passed in front of the car approaching from the north or returned to the place from which she started, with safety. The following from *Fehnrich* v. *Railroad Co.,* 87 Mich. 606, 612, is peculiarly applicable to her situation:

"One put suddenly in peril is not required imperatively to do that which, after the peril is ended, it is seen he might have done and escaped. The law makes allowance for the fright and lack of coolness of judgment incident to such peril."

As was said in *Mercer* v. *Railroad Co.,* 151 Mich. 566, 568, the plaintiff was not "negligent if she chose the alternative which proved to be the more dangerous." See, also, *Weitzel* v. *Railway,* 186 Mich.

7; 29 Cyc. pp. 521, 641, and cases cited.   There was no error in submitting this question to the jury.

2. Defendant's Negligence.   Street cars have no monopoly of the city streets.   Pedestrians are still entitled to use them.   The speed at which such cars are permitted to run, their weight, and the fact that they cannot be deflected from their course, render them peculiarly dangerous, and pedestrians are chargeable with knowledge that they are so.   The conduct of the motorman, when charged with negligence in the operation of his car, must also be viewed with such facts in mind.   When meeting a car which had just started up after stopping at an intersecting street corner, and from which passengers had probably alighted, and meeting another close at hand, a motorman should be watchful and vigilant.   The situation as he can observe it must determine the extent to which he should have his car under control.   He had the means at hand to do so.   Plaintiff's witnesses testified that the car went more than 150 feet after striking her before it was stopped.   The motorman should have seen her as soon as she stepped on the space between the two tracks.   He should also have seen the car approaching from the south, then almost beside her.   Exercising reasonable judgment, he could but have determined that she was in a position of peril.   Did he then do what an ordinarily prudent person in charge of such a car, familiar with the means at hand for its control, would reasonably do?   These questions were submitted to the jury under instructions of which no complaint is made.   We think the court committed no error in doing so.   See *Prince* v. *Railway*, 192 Mich. 194, and cases cited.

3. Other Errors.   In concluding his oral argument, defendant's counsel stated that a new trial was not asked for.   This renders it unnecessary for us to consider the errors assigned on the instruction as to

after-discovered negligence, or the admission or rejection of testimony, or the refusal of defendant's requests to charge, other than that to direct a verdict (already disposed of), because a finding that there was error in any of such respects could but result in a new trial.

4. Excessive Verdict. The jury found for plaintiff in the sum of $15,000. As a condition precedent to the denial of a new trial, the court required plaintiff to remit $3,000. This was done. Defendant insists that it is still excessive. Plaintiff described her injuries as follows:

"I came to my senses about 9 o'clock at night at Providence hospital. I was very, very sick. I was in bed, my head was bandaged up and I felt my tooth was gone. I had this double break in my leg, in my ankle. There is about two inches shortening of the leg; they have attempted to straighten my leg five different times. Two operations were only performed to take the bones out, the loose bones that were broken in there and the others were to straighten it. The ankle is stiff and does not work at all. This accident happened about 5:30 p. m. I had a big gash in my head. I was in about the same condition for a week then erysipelas broke out from the wound in my head. * * * They were going to take me to Herman Keifer but it was not open so they took me home and we had a trained nurse. I remained at home about 10 weeks and was under medical treatment during that time. Dr. Hanna was my physician. My leg was set before I left the hospital but it did not unite. Dr. Hickey took x-ray pictures at Harper hospital; Dr. Chene took them at Providence. I was only in Providence eight days when I was removed home. There was one operation performed at home by Dr. Hanna. After the end of 10 weeks my temperature went down and I was better only my leg would not unite. The part that was broken was a piece broke out just above the ankle, it involved the ankle joint. I had very much pain and suffering from sleeplessness. They gave me a hypodermic for about three weeks and they thought I would be a dope

fiend from taking it, so they stopped on that and I just nearly went crazy.   Dr. Hanna was going away on his vacation, and he put me in good hands of Dr. C. D. Brooks, the surgeon at Harper hospital.   I stayed there about 4 weeks; I went there the latter part of August.   Dr. Brooks performed one operation there.   After the end of four weeks at Harper I went home.   My head was pretty well healed up by that time.   I remained home until after Christmas. I went to friends of mine and stayed with them, Mrs. Hodde.   I remained there about six weeks. From the time the accident occurred up to the present time I never have succeeded in getting the leg or foot straightened around to normal condition.   It was about a year after the accident that I first endeavored to do any work nursing.   Once in a while I would go out.   Since the accident occurred and up to the present time I have not worked the same as I used to.   It was about a year after the accident before I could do anything.   I have earned about $150 altogether since the accident.   Before I earned between $30 and $35 a week.   The expenses were as follows: Dr. Brooks, $100; Dr. Hanna, $250; $10 for the cast; $10 for the x-ray at Harper hospital; Dr. Panzner, $5; $30 for x-ray; $40, Harper hospital; $21, Harper hospital; hospital, $22.75; Harper hospital, $25; $19, Providence hospital; trained nurse, $340; another x-ray, Dr. Hickey, $30; drugs, $100.   I am not under any medical treatment at present.   I had an x-ray taken this week by Dr. Hickey which cost $10."

Dr. Brooks and Dr. Dewitt, two well-known Detroit surgeons, testified the deformity in her limb, except that due to its being shorter than before, could probably be remedied by another operation, which would involve the chiseling or sawing of a callous which unites the two bones and placing them in a correct position. The cost of such an operation would be about $200, and it would be necessary for her to remain in a hospital for a considerable time. That plaintiff's sufferings were intense and lasted for a long period of time admits of no doubt. While the operation referred to would probably correct the posi-

tion her foot is now in, the deformity due to her leg being shortened is permanent. She was 32 years of age at the time of the injury, and unmarried. She must go through life deformed. Such condition cannot but be humiliating to her and may, to some extent at least, interfere with her securing employment at nursing, for which she had fitted herself. The trial court saw her condition, heard the testimony of the surgeons, listened to the story of her suffering, and was able to exercise a much more dependable judgment than we can as to the amount which will reasonably compensate her for the damages she has sustained due to her injury. We are loath, under the record as we read it, to interfere with his determination. *Fishleigh* v. *Railway*, 205 Mich. 145; *Wilson* v. *Railway*, 208 Mich. 411; *Kurtz* v. *Railway*, 221 Mich. 82: *Clumfoot* v. *St. Clair Tunnel Co.*, 221 Mich. 113.

The judgment is affirmed.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, MOORE, and STEERE, JJ., concurred.