PAMPU *v.* CITY OF DETROIT.
GARCIA *v.* SAME.

1. STREET RAILWAYS—PEDESTRIANS—CONTRIBUTORY NEGLIGENCE—NEGLIGENCE—QUESTION FOR JURY—EVIDENCE.

In action for injuries to two northbound pedestrians while crossing defendant's streetcar tracks about dusk late in October near intersection of two streets which crossed each other at a 35-degree angle and near the obtuse angle of which intersection two other north and south streets ended as they joined the easterly portion of one of the streets containing defendant's car tracks, where testimony of witnesses was in sharp contradiction as to issues of contributory negligence and defendant's negligence, questions of fact were presented for determination by jury as to what weight was to be given to the testimony as a whole.

2. SAME—PEDESTRIANS—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

Northbound pedestrian who had observed defendant's westbound streetcar, approaching some 250 to 300 feet away and traveling 20 miles per hour, while he had some 17 feet to traverse before streetcar reached that point, had time to go such distance and his reliance on streetcar stopping at its usual place, as he stood with one foot astride northerly rail, would not be negligence *per se* on his part, but raised a question for the jury as to his contributory negligence, especially where oncoming eastbound

automobile traffic turning onto 42-foot pavement immediately north of car track, momentarily precluded safe passage across such pavement.

3. NEGLIGENCE—SUDDEN DANGER.

One who finds himself in a perilous situation cannot be charged with negligence merely because it appears that had he acted in a different manner or had opportunity to deliberate, an accident possibly might have been avoided.

4. STREET RAILWAYS—NEGLIGENCE OF MOTORMAN—TRAFFIC LIGHT—PEDESTRIANS—EVIDENCE.

Whether or not motorman on westbound streetcar was guilty of negligence was a question for the jury where there is evidence that car for some 250 to 300 feet was approaching street intersection with red light showing and failed to stop at usual place and injured two northbound pedestrians, one of them fatally, as they were crossing, but imperilled from clearing, tracks on east side of intersection because of eastbound automobile traffic passing on north side of track.

Appeal from Wayne; Richter (Theodore J.), J. Submitted June 4, 1946. (Docket Nos. 5, 6, Calendar Nos. 43,326, 43,327.) Decided October 7, 1946.

Separate actions of case by John J. Pampu and Rudolph Garcia, administrator of the estate of Esther B. Garcia, deceased, against City of Detroit, Department of Street Railways, a municipal corporation, for injuries and death resulting from being struck by defendant's streetcar. Cases consolidated for trial. Verdicts and judgments for plaintiffs. Defendant appeals. Affirmed.

*Maxwell I. Silverstein* and *Nathan D. Rosin* (*Vandeveer & Haggerty,* of counsel), for plaintiffs.

*Rodney Baxter* and *Ralph L. Hayes* (*A. Albert Bonczak,* of counsel), for defendant.

BUTZEL, C. J. On October 21, 1940, about 6:10 p.m., while it was still light out but with darkness

fast approaching, John Pampu, plaintiff in the one case, and Esther B. Garcia, plaintiff's decedent in the companion case, started to cross from the south to the north side of Ferndale avenue at the east intersection of Ferndale, Dix and Canterbury avenues near Westlawn avenue in the city of Dearborn, Michigan. For clarity, we find it necessary to attach a map to this opinion. It will be seen that Dix avenue is 107 feet wide south of the intersection and slightly over 80 feet wide north of the intersection, and it forms an approximate 35-degree angle with Ferndale avenue which is 80 feet wide on the west and 120 feet wide on the east, where plaintiff attempted to cross. Canterbury avenue runs north and south and apparently ends at Dix avenue into which it runs. Westlawn is one block east of Canterbury and also runs north and south and seems to end at Ferndale avenue. If projected across to the north side, due to the peculiar angle of the intersection, Westlawn is but a short distance east of Dix avenue. East of the intersection, Ferndale avenue is so divided that starting from the south there is a 23-foot width of concrete road, then a 55-foot center strip of dirt, and finally a 42-foot concrete road used for both easterly and westerly traffic. The dirt strip ends shortly before the southeast corner of Ferndale and Dix avenues. The streetcar tracks are laid in the dirt strip so as to curve at the intersection from the north edge of the strip to the center of the strip at a point beyond Westlawn avenue. At a point west of Westlawn, however, they extend across Dix avenue down the center of Ferndale avenue.

According to the testimony of Pampu, he and decedent started to cross Ferndale at a point somewhat west of the gas station on the southwest corner of Westlawn and Ferndale, in order to reach the

northeast corner of Ferndale and Dix avenues, almost opposite. When he reached the car tracks he observed the traffic light at the southeasterly part of the island on the north side of Dix avenue. At the time of crossing, according to his testimony, automobiles going west were halted because of the red traffic light, which he had noticed. At the point of his crossing the streetcar tracks had almost converged with the concrete pavement, so that there was but a foot or two of dirt between the northerlymost rail and the concrete. This is referred to in the record as the "Devil's strip." Pampu testified that when he was about two feet from the south rail of the eastbound track, he looked to the right and saw one of the cars of the railway system of the city of Detroit approaching from the east and about 250 to 300 feet away at the rate of about 20 miles per hour. He negotiated the 17 feet to the last rail in about 4 or 5 seconds, and then hesitated about 5 seconds at the point marked "X" on the map, with his right foot inside the northerlymost rail and his left foot forward over the rail, while he watched an automobile making a right turn from Dix avenue on to Ferndale avenue. The automobile as it proceeded was heading straight towards him. Pampu testified that he did not look again at the streetcar during this time as he thought it would stop farther back near Westlawn, where the dirt strip between the concrete and track was wider, so that the passengers could alight there and not be endangered by alighting directly on the highway. He testified that, although there was no designated stop, the streetcar usually stopped near Westlawn. Pampu further testified that while hesitating and standing in the Devil's strip, he was watching an automobile making a right turn directly in front of him, and that the streetcar struck Mrs. Garcia, who stood a

few feet to the right and beyond him, and that when she screamed, he turned his head in that direction and then was struck by the streetcar and thrown onto the fender of the automobile making the right turn, which then carried him about 30 feet. Pampu also testified that the streetcar did not ring a warning gong, and that he not only believed the car would stop farther back to discharge passengers, but that also because of the red light it would stop there as usual, so as not to interfere with traffic turning right from Dix onto the 42-foot concrete strip of Ferndale.

Pampu's testimony the substance of which we have given, was most sharply contradicted by witnesses for defendant. While we are much impressed with the latter testimony and, though possibly if we were on the jury, we might have come to a different conclusion, we cannot say that there was not a jury question presented, both as to contributory negligence and defendant's negligence. It became an issue of fact for the jury to determine what weight was to be given to the testimony as a whole. *Wilson v. City of Detroit,* 299 Mich. 473. The jury found for plaintiffs.

Defendant in its appeal contends that the verdicts were contrary to the great weight of the evidence; that there was no negligence shown on the part of defendant, and even if there were, plaintiff and plaintiff's decedent were guilty of contributory negligence. Plaintiffs in their declarations further claim that defendant, through its agents, saw plaintiff and plaintiff's decedent in a dangerous and perilous situation, or by exercise of ordinary care should have discovered such dangerous position in time to avoid striking them, et cetera. The judge charged the jury that if defendant's motorman saw and knew that plaintiff and plaintiff's decedent were

in such a dangerous position and that they could not extricate themselves from such condition of peril or reach a place of safety unless the car was stopped, and the motorman could have applied his brakes and stopped his car but did not do so, and that plaintiff and plaintiff's decedent were free from contributory negligence, they should find a verdict for plaintiffs.

Plaintiff Pampu suffered severe injuries and the other plaintiff's decedent was killed. Defendant claims that the streetcar never struck either plaintiff or plaintiff's decedent, but that they were struck by an automobile which carried them for some distance. There is strong testimony on the part of defendant's witnesses to support this contention. However, it became a question for the jury to determine whether to believe plaintiffs' or defendant's witnesses.

When Pampu started to cross the tracks, the streetcar was 250 to 300 feet away and traveling 20 miles per hour. Even if the street car did not stop at the usual place, he had time to cross the approximate 17 feet before the streetcar arrived at that point. Furthermore, relying on a streetcar stopping at the usual place is not negligence *per se,* but raises a question for the jury. *Richardson* v. *Detroit United Railway,* 176 Mich. 160; *Sailsky* v. *Detroit United Railway,* 176 Mich. 261; *Spreng* v. *Detroit United Railway,* 197 Mich. 343. The facts differ from *Rosenfeld* v. *City of Detroit,* 274 Mich. 650.

As Pampu walked across the tracks, he noticed an automobile making a right turn heading right in front of him and, therefore, he stopped for 4 or 5 seconds to allow it to pass. It is true that he could have pulled his right foot forward off the track for he was in a perilous position. We, however, have frequently held that where someone finds himself

in a perilous situtation, he cannot be charged with negligence merely because it appears that had he acted in a different manner an accident possibly might have been avoided. His actions are not to be judged by what he should have done had he the opportunity to deliberate. The question of his negligence under those circumstances is for the jury. *Burton* v. *Yellow & Checker Cab & Transfer Co.,* 283 Mich. 384; *Schnurr* v. *Detroit United Railway,* 222 Mich. 591.

At the distance of 250 to 300 feet from the pedestrian, the motorman was approaching an intersection with a red light showing. The respective rights of streetcars and pedestrians have frequently been discussed by this court. We have held that the motorman of a streetcar may owe certain duties to pedestrians when he sees them in a place of danger from which they cannot extricate themselves without great hazard. The mutual rights of the parties are set forth in *Spreng* v. *Detroit United Railway, supra.* There we held that a jury question was presented when a pedestrian, expecting the streetcar to stop, while crossing the tracks was injured because of the failure to stop the car by the motorman who could and should have seen the pedestrian in ample time to prevent the accident. We cannot set down a fixed rule, nor are we much benefited by the cases which all hinge on different facts. We believe, however, that the facts and circumstances of the present case are such that a jury question was presented.

Judgments are affirmed, with costs.

CARR, BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred. STARR, J., took no part in the decision of this case.