STOWERS *v.* WOLODZKO

1. HUSBAND AND WIFE—MEDICAL EXPENSES—HOSPITAL EXPENSES—
   FUNERAL EXPENSES—HUSBAND'S LIABILITY—MEDICAL CARE.

   The general rule that a husband is primarily liable for the pay-
   ment of his wife's reasonable medical, hospital and funeral
   expenses does not mean that a husband can force medical care
   upon his wife; rather, this means that once medical care has
   been consented to by a wife, the husband must pay for it.

2. FALSE IMPRISONMENT—ASSAULT AND BATTERY—PHYSICIANS AND
   SURGEONS—MENTAL HEALTH.

   Trial court properly ruled as a matter of law that a defendant-
   doctor could not be found guilty for any actions taken up to
   the time plaintiff was hospitalized where she was hospitalized
   under a statute providing for temporary detention at a mental
   institution and brought action against the doctor for dam-
   ages for false imprisonment and assault and battery (MCLA
   § 330.21).

3. MENTAL HEALTH—STATUTES—CONSTRUCTION.

   Michigan has recognized the principal of *expressio unius est
   exclusio alterius*—express mention in a statute of one thing
   implies the exclusion of other similar things; therefore, a
   statute providing that a person removed to a hospital shall
   be "detained until such petition can be heard" does not mean
   that he should be detained and treated (MCLA § 330.21).

4. STATUTES—CONSTRUCTION.

   A statute must be construed as a whole; every word of a statute
   should be given meaning and no word should be treated as
   surplusage or rendered nugatory if at all possible.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5–9, 11–13, 15]  32 Am Jur 2d, False Imprisonment § 75.
   41 Am Jur, Physicians and Surgeons § 108 *et seq.*
[3]  50 Am Jur, Statutes § 244.
[4]  50 Am Jur, Statutes § 358.
[10]  39 Am Jur 2d, Habeas Corpus § 28 *et seq.*
[14]  5 Am Jur 2d, Appeal and Error § 891.

5. Mental Health—Hospitals—State Hospitals—Private Hospitals—Statutes.

Under a statute providing for temporary detention at a mental institution a clear distinction is made between referral to a state hospital where custody and treatment are authorized, and a private hospital where a patient is only to be detained until a petition can be heard and determined (MCLA § 330.21).

6. Physicians and Surgeons—Mental Health—Hospitals—Patient's Care—Statutes.

Statute providing for temporary detention at a mental institution does not authorize a doctor to administer any care to a patient which is not necessary to keep a person on the premises or to prevent harm to the patient or others (MCLA § 330-.21).

7. Assault and Battery—Physicians and Surgeons—Mental Health—Hospitals—Private Hospitals—State Hospitals—Statutes.

Treatment of a patient detained at a private hospital until a petition could be heard and determined was not privileged because of a statute which only authorized treatment at a state institution and a jury, under the evidence, could find the defendant-doctor liable for assault and battery for treating the patient after the patient had refused such treatment (MCLA § 330.21).

8. False Imprisonment—Words and Phrases.

False imprisonment is the unlawful restraint of an individual's personal liberty of freedom of locomotion and holding a person incommunicado is clearly a restraint of one's freedom sufficient to allow a jury to find false imprisonment.

9. False Imprisonment.

Interference with attempts of persons incarcerated to obtain their freedom may constitute false imprisonment.

10. Habeas Corpus—Judges—Malfeasance.

A circuit judge who wilfully or corruptly refuses or neglects to consider an application, action, or motion for habeas corpus, is guilty of malfeasance in office (MCLA § 600.4313).

11. False Imprisonment — Physicians and Surgeons — Mental Health — Hospitals.

Actions of defendant-doctor which prevented plaintiff from communicating with a lawyer or relative in order to obtain her

release from a mental institution constituted false imprisonment.

12. MENTAL HEALTH — HOSPITALS — PATIENT'S RIGHTS — ATTORNEY AND CLIENT.

A person temporarily committed to an institution pursuant to statute has a right to make telephone calls to an attorney or relatives and to communicate with them in an attempt to obtain his release (MCLA § 330.21).

13. ASSAULT AND BATTERY—PHYSICIANS—COURT ORDER.

There was sufficient evidence that a jury could find that defendant-doctor committed assault and battery on plaintiff, a patient in a private mental institution, because there was no authority given by a court order, issued pursuant to a statute, which order temporarily detained plaintiff at that institution and there clearly was a nonconsensual touching of the plaintiff where defendant did not contend that he did not order certain medication and shots to be given plaintiff (MCLA § 330.21).

14. TRIAL—INSTRUCTIONS—APPEAL AND ERROR.

Defendant cannot be heard to object on appeal to jury instructions where the record clearly shows that counsel for both parties had agreed to the instructions the trial court finally gave (GCR 1963, 516.2).

15. DAMAGES—FALSE IMPRISONMENT—ASSAULT AND BATTERY.

Jury award of $40,000 damages in an action for false imprisonment and assault and battery was not excessive and should not be set aside where there was no evidence of appeals, either by counsel or the trial court, to show sympathy, passion, partiality or prejudice against defendant-doctor as the verdict must be reviewed on appeal in the light most favorable to plaintiff who suffered a great deal of pain, suffering and humiliation and the defendant had told plaintiff, who was temporarily detained in a mental institution, that if she attempted to contact her lawyer or her relatives she would never see her children again because such statements and the fears they would instill are impossible to determine in an exact amount, the amount awarded was within the range of the evidence and does not shock the judicial conscience of the Michigan Supreme Court.

Appeal from Court of Appeals, Division 1, Fitzgerald, P. J., and Levin and T. M. Burns, JJ., revers-

ing Wayne, Benjamin D. Burdick, J. Submitted June 8, 1971. (No. 2 June Term 1971, Docket No. 52,599.) Decided November 9, 1971.

19 Mich App 115 affirmed.

Complaint by Ethel Stowers against Anthony Smyk, Joseph Wolodzko, and Ardmore Acres Hospital for false imprisonment, assault and battery, and malpractice. Summary judgments for Anthony Smyk and Ardmore Acres Hospital. Joseph Wolodzko's motions for directed verdict granted as to count of malpractice. Verdict against Joseph Wolodzko. On motion for judgment notwithstanding verdict, the verdict was reduced by *remittitur* and judgment entered. Defendant Wolodzko appealed to the Court of Appeals and plaintiff cross-appealed. Affirmed and verdict reinstated. Defendant Wolodzko appeals. Affirmed.

*Kelman, Loria, Downing & Schneider,* for plaintiff.

*Moll, Desenberg, Purdy, Glover & Bayer,* for defendant.

SWAINSON, J. This case presents complicated issues concerning the liability of a doctor for actions taken subsequent to a person's confinement in a private mental hospital pursuant to a valid court order. The facts are seriously in dispute, both parties being in disagreement as to precisely what did occur. A full statement of the allegations of both parties is necessary in order that a proper framework be developed in an effort to resolve the legal issues involved.

Plaintiff, a housewife, resided in Livonia, Michigan, with her husband and children. She and her husband had been experiencing a great deal of marital difficulties and she testified that she had informed her husband two months previous to the events giving rise to this cause of action that she intended to file for a divorce.

On December 6, 1963, defendant appeared at plaintiff's home and introduced himself as "Dr. Wolodzko." Dr. Wolodzko had never met either plaintiff or her husband before he came to the house. He stated that he had been called by the husband, who had asked him to examine plaintiff. Plaintiff testified that defendant told her that he was there to ask about her husband's back. She testified that she told him to ask her husband, and that she had no further conversation with him or her husband. She testified that he never told her that he was a psychiatrist.

Dr. Wolodzko stated in his deposition (taken December 1, 1966) that he told plaintiff he was there to examine her. However, upon being questioned upon this point, he stated that he could "not specifically" recollect having told plaintiff that he was there to examine her. He stated in his deposition that he was sure that the fact he was a psychiatrist would have come out, but that he couldn't remember if he had told plaintiff that he was a psychiatrist.

Plaintiff subsequently spoke to Dr. Wolodzko at the suggestion of a Livonia policewoman, following a domestic quarrel with her husband. He did inform her at that time that he was a psychiatrist.

On December 30, 1963, defendant Wolodzko and Dr. Anthony Smyk, apparently at the request of plaintiff's husband and without the authorization, knowledge, or consent of plaintiff, signed a sworn

statement certifying that they had examined plaintiff and found her to be mentally ill. Such certificate was filed with the Wayne County Probate Court on January 3, 1964, and on the same date an order was entered by the probate court for the temporary hospitalization of plaintiff until a sanity hearing could be held. The judge ordered plaintiff committed to Ardmore Acres, a privately operated institution, pursuant to the provisions of MCLA § 330-.21 (Stat Ann 1963 Cum Supp § 14.811).

Plaintiff was transported to Ardmore Acres on January 4, 1964. Precisely what transpired on this date is greatly in dispute by the parties.

Plaintiff testified that on the evening of January 4, 1964, she was in her bedroom, partially undressed; that her children and husband were upstairs; that the doorbell rang and she went to the door; that there were two men in white jackets at the door and Dr. Wolodzko was behind some shrubs outside the door; that the two men pushed past her into the house, the doctor following. Plaintiff further testified that the two men grabbed her, and defendant told her he was there to take her to an institution because she was mentally ill. He showed her a court order, but refused to allow her to read it. She asked to use the telephone, received no response, then asked to be allowed to get dressed, and went down a hallway, picked up the telephone and dialed the operator. Plaintiff testified that defendant called out, "Grab her, don't let her use the telephone." The ambulance attendants took the telephone away from her and pushed her into the bedroom, where she got dressed. She told defendant she did not want to go and pleaded with him to let her use the telephone to contact relatives or an attorney. His alleged response was to tell the ambulance driver to get a strait jacket. Plaintiff then

told them that a strait jacket would not be necessary, and agreed to accompany them.

Defendant stated in his deposition that he went to plaintiff's home on January 4, 1964, and that when he arrived only the plaintiff and her family were present. He said that the ambulance and the two attendants arrived a quarter to one-half hour later. He said he couldn't recall that he told plaintiff he had a court order, or that he told the ambulance attendants to seize her and take her from the house, but that it was possible he had done so. In response to a question, he stated he could not recall that she had tried to use the telephone, or that it was taken from her. He stated that he was called to plaintiff's home by her husband to re-examine her, and did not know that she was to be sent to a hospital. He could not recall telling her that she had to go with him or that she would be tied to a stretcher if she refused.

However at the trial, defendant, on cross-examination, testified that on January 4, 1964, he made arrangements to meet Mr. Stowers and the ambulance people outside the Stowers' house. He stated that he met them on a corner some distance from the house and told the husband that the ambulance should stay out of sight. He went to see Mrs. Stowers and then her husband called the ambulance people, and when they came in he went upstairs with Mr. Stowers and the two children. He further testified that he issued no instructions to the ambulance attendants and did not see Mrs. Stowers attempt to use the telephone.

Robert Brooks, one of the ambulance attendants who took Mrs. Stowers to the hospital, testified that he met the defendant and Mr. Stowers on a corner near the Stowers' home. Upon being signaled, he went to the home and Mrs. Stowers opened the door.

Mrs. Stowers was behind the door and he told her why he was there. He stated that the children were hysterical, that the plaintiff became violent, that they grabbed her, that she got loose and ran into the bedroom, that they followed her and during the resulting melee the bed was broken. In response to a question from plaintiff's counsel, the ambulance attendant stated that he had been in the business for 13 years and had taken five to six people a week to mental institutions. He testified that he did not recall plaintiff trying to use the telephone and that he was not told to use a strait jacket to restrain her.

The parties are in substantial agreement as to what occurred at Ardmore Acres. Defendant requested permission to treat the plaintiff on several different occasions, and she refused. For six days, she was placed in the "security room," which was a bare room except for the bed. The windows of the room were covered with wire mesh. During five of the six days, plaintiff refused to eat, and at all times refused medication. Defendant telephoned orders to the hospital and prescribed certain medication. He visited her often during her stay.

When plaintiff arrived at the hospital she was refused permission to receive or place telephone calls, or to receive or write letters. Dr. Wolodzko conceded at the trial that plaintiff wished to contact her brother in Texas by telephone and that he forbade her to do so. After nine days, she was allowed to call her family, but no one else. Plaintiff testified on direct examination that once during her hospitalization she asked one of her children to call her relatives in Texas and that defendant took her to her room and told her, "Mrs. Stowers, don't try that again. If you do, you will never see your children again." It is undisputed that plaintiff repeatedly

requested permission to call an attorney and that
Dr. Wolodzko refused such permission.

At one point when plaintiff refused medication,
on the written orders of defendant, she was held
by three nurses and an attendant and was forcibly
injected with the medication.   Hospital personnel
testified at the trial that the orders concerning medi-
cation and deprivation of communication were pur-
suant to defendant's instructions.

Plaintiff, by chance, found an unlocked telephone
near the end of her hospitalization and made a call
to her relatives in Texas.   She was released by court
order on January 27, 1964.

Plaintiff filed suit alleging false imprisonment, as-
sault and battery, and malpractice, against defend-
ant Wolodzko, Anthony Smyk and Ardmore Acres.
Defendants Ardmore Acres and Smyk were dis-
missed prior to trial.   At the close of plaintiff's
proofs, defendant moved for a directed verdict.
The court granted the motion as to the count of
malpractice only, but allowed the counts of assault
and battery and false imprisonment to go to the jury.
At the conclusion of the trial, the jury returned a
verdict for plaintiff in the sum of $40,000.   The court
denied defendant's motion for judgment notwith-
standing verdict, but granted a conditional order for
a new trial unless a *remittitur* was filed for the ex-
cess above $30,000.   The Court of Appeals[1] reversed
the order for *remittitur* and reinstated the jury ver-
dict of $40,000.   We granted leave to appeal.   383
Mich 794.

## *I.*

Defendant has raised five issues on appeal.   The
first issue is whether a jury could find defendant

---

[1] *Stowers* v. *Wolodzko* (1969), 19 Mich App 115.

Wolodzko liable for assault and battery for treating plaintiff, who was temporarily hospitalized pursuant to MCLA § 330.21 (Stat Ann 1963 Cum Supp § 14-.811), after the plaintiff had refused such treatment?

Defendant contends that his treatment of plaintiff was required regardless of her consent because of the contract he had made with her husband to provide medical care for her. He implies that a husband has an almost absolute right to force his wife, if he believes her to be incompetent, to receive any medical treatment that he desires for her. He cites several cases which he contends stand for this proposition. None of them are on point.

One of the cases most frequently cited by defendant is *Maben* v. *Rankin* (1961), 55 Cal 2d 139 (10 Cal Rptr 353, 358 P2d 681). The Court of Appeals stated concerning the *Maben* case (fn 12, pp 125, 126):

"Defendant often cites this case in support of a number of his assertions, but recognizes that the California statutes differ, as do the facts, from our problem here. California statutes provided for what could amount to 90 days hospitalization without a court order upon the certificate of one doctor. No certificate was necessary for the treatment which may ensue, subject to the statutory liability of the doctor for any negligence in that treatment. The patient was also permitted by statute to contact others and inform them of his detention. The detention had to cease after 90 days unless the patient wished to remain, or unless the court then issued an order continuing the detention or unless a relative or friend obtained two doctors' certificates in support of continued detention. Any California statute in any way similar to our temporary detention statute was not before the *Maben* court. See West's Annotated California Codes, Welfare and Institutions,

§§ 5750, 5750.1–5750.3 [repealed 1965, see §§ 6030–6033], 5751 [renumbered § 6250], 5752 [renumbered § 6251]."

This Court stated in *In re LaFreniere's Estate* (1949), 323 Mich 562, that:

"The general rule is that a husband is primarily liable for the payment of his wife's reasonable medical, hospital and funeral expenses."

*Detroit* v. *Eisele* (1961), 362 Mich 684, stands for the same proposition. However, this does not mean that a husband can force medical care upon his wife. Rather, this means that once medical care has been consented to by a wife, the husband must pay for it. These cases are, therefore, not on point.

Likewise, *Johnson* v. *Borland* (1947), 317 Mich 225, and *Wood* v. *Vroman* (1921), 215 Mich 449, are not on point. In *Johnson* v. *Borland* (a malpractice action), the Court held that a physician who rendered services gratuitously had the duty of exercising reasonable and ordinary care, skill and diligence.

*Wood* v. *Vroman, supra,* stands for the same proposition. However, there is no question of defendant's malpractice in this case and, thus, both *Johnson* and *Wood* are not relevant to our determination in this situation.[2]

Defendant contends that under the probate court order he had not only the right, but the duty, to give plaintiff medical care and treatment. He contends that since there was no evidence of malpractice, he could not be liable for assault and battery because of the care and treatment he gave plaintiff at the

---

[2] *Fortner* v. *Koch* (1935), 272 Mich 273, and *Buchanan* v. *Kull* (1949), 323 Mich 381, both deal with the necessity of a surgeon using reasonable and ordinary care until the physician-patient relationship is terminated. The question we are dealing with here, however, is whether the physician-patient relationship was created in the first instance.

hospital.  He relies on *Dabkowski* v. *Davis* (1961),
364 Mich 429, and *Olepa* v. *Mapletoff* (1966), 2 Mich
App 734.  In *Dabkowski,* plaintiff sued two physi-
cians for false imprisonment and assault and
battery.  Plaintiff's husband had applied to the pro-
bate court to have her committed to a state hospital
as a mentally ill person.  The two defendants certi-
fied that plaintiff should be committed to the Kent
County Receiving Hospital, and the probate court
so ordered.  Plaintiff was taken to the Kent County
Receiving Hospital where she remained for 11 hours
and was then released upon rescission of the emer-
gency order.  The trial court dismissed plaintiff's
action, and this Court affirmed.  The doctors had
acted pursuant to MCLA § 330.21 (Stat Ann 1959
Cum Supp § 14.811), the same statute involved in
this case.  The Court stated (pp 433, 434):

"It is clear that the statements of opinion by the
doctors in the certificates before us are absolutely
privileged.  They were submitted while a sanity
proceeding of plaintiff was pending, related to the
emergency commitment of the plaintiff, and were
submitted to the court having jurisdiction in the
premises."

Thus, our Court has held that a physician is not
liable for statements he makes in connection with
the temporary commitment of a patient.  However,
that is not the issue before us.  The issue here is:
Whether once a patient is admitted to the hospital
pursuant to MCLA § 330.21 (Stat Ann 1963 Cum
Supp § 14.811), may the doctor then give treatment
without the patient's consent?

The trial court ruled as a matter of law that the
defendant could not be found guilty for any actions
taken up to the time plaintiff was hospitalized.
Thus, insofar as *Dabkowski* and *Mapletoff* were

applicable (*i.e.*, up to the time of commitment), the trial court correctly applied and followed them in this case. These cases, however, do not state a defense to the actions of the doctor subsequent to plaintiff's admission to Ardmore Acres.

The Court of Appeals held that defendant was liable under MCLA § 330.21 (Stat Ann 1963 Cum Supp § 14.811). That statute provides:

"The   *   *   *   *husband*   *   *   *   of a person *alleged* to be mentally ill, mentally handicapped or epileptic,   *   *   *   *may petition* the probate court of said county for an order directing the admission of said person to a hospital, home or institution for the care of the mentally ill,   *   *   *   such petition to contain a statement giving the facts and not the conclusions upon which the allegation of such mental disease is based and because of which the application for the order is made. Upon receiving such petition the court shall fix a day for hearing thereof and shall appoint 2 reputable physicians to make the required examination of such alleged mentally diseased person; such physicians shall file their report duly certified to with the court on or before such hearing.   *   *   *   The court shall also take proofs as to the alleged mental condition or epilepsy of such person, and fully investigate the facts, and, if no jury is requested, the probate court shall determine the question of such alleged mental disease of such person.   *   *   *   *Pending such proceedings for admission* into the proper home, hospital or institution, *if it shall appear, upon the certificate of 2 legally qualified physicians, to be necessary and essential so to do, the court may order such alleged mentally diseased person* to be placed in the custody of some suitable person, or to be removed to *any hospital,* home or retreat to be detained until such petition can be heard and determined or to be removed to *any state hospital for the mentally diseased for custody and treatment. The period of such tem-*

*porary detention shall not exceed 60 days*   *   *   * *."* (Emphasis added.)

The Court of Appeals stated (p 122):

"Reference to the statute quoted above shows that treatment of a patient temporarily detained in a *state* hospital is authorized by law, but that no mention of treatment of a patient in a *private* hospital, such as Ardmore Acres, is made. Therefore, no mandatory nor implied duty of the defendant to treat plaintiff attached by reason of the court order. The result is that the treatment of plaintiff as a patient becomes subject to the same examination by the jury as if there was no court action involved at all."

Defendant points out that this is the first such interpretation made of MCLA § 330.21 (Stat Ann 1963 Cum Supp § 14.811). This is a case of first impression on this point. The Court of Appeals' decision is the first interpretation as to whether there is a distinction between treatment in a state hospital and a private institution.

In 2 OAG, 1955–1956, No 2,847, p 693 (Nov 26, 1956), a similar problem was dealt with involving treatment under the Michigan statutes for patients removed to a regional diagnostic center for diagnostic care. The Attorney General stated:

"On the one hand, the statute clearly provides that the patient is referred for diagnosis, care and treatment. On the other, the sole purpose of the referral is to obtain diagnosis. *At the time of the diagnostic referral, no judicial determination of mental illness has taken place.*   *   *   *

"Prior to final adjudication by the court, any treatment given without consent of the patient, *other than that necessary to keep him on the premises and to prevent his injuring himself or others, is given at*

*the peril of the superintendent, and may give rise
to liability for assault or for trespass.  * * ***

"It should be emphasized, however, *that the pa-
tient referred for diagnosis has not been determined
to be insane,* and for this reason superintendents
should be advised that they *may be incurring a per-
sonal risk by administering any care and treatment
not clearly and demonstrably essential to the making
of the diagnosis, or to the safeguarding of the pa-
tient."* (Emphasis added.)

We have an analogous situation with temporary
commitment under MCLA § 330.21 (Stat Ann 1963
Cum Supp § 14.811). While the patient has been
certified to be mentally ill by two doctors under the
statute, there has not been a determination of in-
sanity. The statements of the Attorney General as
to liability for assault when a patient is removed for
diagnostic care does apply in this situation.

Moreover, in addition to this Attorney General's
opinion, general rules of statutory construction
support our interpretation of this statute. Michigan
has recognized the principal of *expressio unius est
exclusio alterious*—express mention in a statute of
one thing implies the exclusion of other similar
things. *Dave's Place, Inc.,* v. *Liquor Control Comm.*
(1936), 277 Mich 551; *Sebewaing Industries, Inc.,* v.
*Sebewaing* (1953), 337 Mich 530.

The statute provides that a person removed to a
hospital shall be "detained until such petition can
be heard"—not detained and treated. Thus, the
above maxim is applicable to this case. Moreover, a
statute must be construed as a whole. 82 CJS,
Statutes, § 345, p 691. *Argo Oil Corporation* v.
*Atwood* (1935), 274 Mich 47; *Smith* v. *Wayne
County Sheriff* (1936), 278 Mich 91.

Every word should be given meaning and no word
should be treated as surplusage or rendered nuga-
tory if at all possible. *Scott* v. *Budd Company*

(1968), 380 Mich 29; *Melia* v. *Employment Security Commission* (1956), 346 Mich 544. Under the statute a clear distinction is made between referral to a state hospital where custody and treatment are authorized, and a private hospital where a patient is only to be "detained until such petition can be heard and determined." If we were to accept defendant's contention that there is no distinction between private and state hospitals, we would be avoiding the clear meaning of the statute and treating a part of the statute as surplusage.

We, therefore, hold that the Court of Appeals was correct in its construction of MCLA § 330.21 (Stat Ann 1963 Cum Supp § 14.811). The statute does not authorize defendant to administer any care to the plaintiff which is not necessary to keep a person on the premises or to prevent harm to the patient or to others. (2 OAG, 1955–1956, *supra*)

Defendant concedes that he did treat the plaintiff in this case and that if his treatment was not privileged, he would be liable for assault and battery. We hold that the treatment was not privileged because of MCLA § 330.21 (Stat Ann 1963 Cum Supp § 14.811), and that a jury, under the evidence, could find defendant liable for assault and battery. Thus, we do not find merit in defendant's first issue on appeal.

## II.

The second issue involves whether or not there was evidence from which a jury could find false imprisonment.

"False imprisonment is the unlawful restraint of an individual's personal liberty or freedom of locomotion." 35 CJS, False Imprisonment, § 1 p 621. It is clear that plaintiff was restrained against her will.

Defendant, however, contends that because the detention was pursuant to court order (and hence not unlawful), there can be no liability for false imprisonment. However, defendant was not found liable for admitting or keeping plaintiff in Ardmore Acres. His liability stems from the fact that after plaintiff was taken to Ardmore Acres, defendant held her incommunicado and prevented her from attempting to obtain her release, pursuant to law. Holding a person incommunicado is clearly a restraint of one's freedom, sufficient to allow a jury to find false imprisonment.

Defendant contends that it was proper for him to restrict plaintiff's communication with the outside world. Defendant's witness, Dr. Sidney Bolter, testified that orders restricting communications and visitors are customary in cases of this type. Hence, defendant contends these orders were lawful and could not constitute the basis for an action of false imprisonment. However, the testimony of Dr. Bolter is not conclusive on this point.

Psychiatry is a relatively new professional discipline and, as with all disciplines, there is a great deal of controversy within the profession as to precisely what methods of treatment should be used. Psychiatrists have a great deal of power over their patients. In the case of a person confined to an institution, this power is virtually unlimited. All professions (including the legal profession) contain unscrupulous individuals who use their position to injure others. The law must provide protection against the torts committed by these individuals. In the case of mental patients, in order to have this protection, they must be able to communicate with the outside world. In our country, even a person who has committed the most abominable crime has the right to consult with

an attorney. *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

Our Court and the courts of our sister States have recognized that interference with attempts of persons incarcerated to obtain their freedom may constitute false imprisonment.[3] Further, we have jealously protected the individual's rights by providing that a circuit judge "who wilfully or corruptly refuses or neglects to consider an application, action, or motion for habeas corpus, is guilty of malfeasance in office." MCLA § 600.4313 (Stat Ann 1962 Rev § 27A.4313).

*Hoff* v. *New York* (1939), 279 NY 490, 492, 493 (18 NE2d 671), involved an action against the superintendent of a state hospital for diverting a letter containing a writ of habeas corpus from the plaintiff to his attorney. The lower courts dismissed the complaint, and the New York Court of Appeals reversed, holding that the complaint stated a cause of action. The plaintiff's wife had requested that the superintendent forward all mail to her and he had done so in accordance with her instructions. The court stated:

"The right of persons, deprived of liberty, to challenge in the courts the legality of their detention is safeguarded by the Constitution of the United States and by the Constitution of the State. * * * Doubtless the superintendent acted in the honest belief that the claimant was insane. Nevertheless, his act delayed for a time a test of the claimant's sanity which, when made, resulted in his discharge.

"We can find no basis for any claim that the superintendent's action was justifiable. * * *

---

[3] For somewhat different fact situations where our Court has held that actions which delay a person's release may constitute false imprisonment, see *Linnen* v. *Banfield* (1897), 114 Mich 93, and *Oxford* v. *Berry* (1918), 204 Mich 197.

"The right of the superintendent in the exercise of a reasonable discretion to censor the ordinary mail written by a patient who has been adjudged insane is not challenged. The question is whether the superintendent of a State hospital for the insane may in the exercise of his discretion obstruct or delay a challenge of the legality of detention by a patient held under a court order. To that question one answer is clearly dictated. The State cannot under the Constitution withhold the privilege of the writ of habeas corpus. * * * An officer of the State who detains a man under command of the State may not by indirection accomplish what the Constitution forbids to the State. He may not lawfully withhold from a person so detained the opportunity to apply for a writ of habeas corpus."

The reasoning of the New York Court of Appeals is applicable to our case. Although plaintiff was not attempting to use a writ of habeas corpus, she was attempting to communicate with a lawyer or relative in order to obtain her release. Defendant prevented her from doing so. We agree with the reasoning of the New York court and hold that the actions on the part of defendant constitute false imprisonment.

A person temporarily committed to an institution pursuant to statute certainly must have the right to make telephone calls to an attorney or relatives. We realize that it may be necessary to restrict visits to a patient confined to a mental institution. However, the same does not apply to the right of a patient to call an attorney or relative for aid in obtaining his release. This does not mean that an individual has an unlimited right to make numerous telephone calls, once he is confined pursuant to statute. Rather, it does mean that such an individual does have a right to communicate with an attorney and/or a relative in an attempt to obtain his release.

Dr. Bolter was unable to give any valid reason why a person should not be allowed to consult with an attorney. We do not believe there is such a reason. While problems may be caused in a few cases because of this requirement, the facts in the instant case provide cogent reasons as to why such a rule is necessary. Mrs. Stowers was able to obtain her release after she made the telephone call to her relatives and they, in turn, obtained an attorney for her. Prior to this, because of the order of no communications, she was virtually held a prisoner with no chance of redress. We, therefore, agree with the Court of Appeals that there was sufficient evidence from which a jury could find that Dr. Wolodzko had committed false imprisonment.[4]

## III.

The third issue involves whether there was evidence from which a jury could find that defendant had committed the tort of assault and battery. Defendant contends that because he was acting pursuant to a court order, there could be no liability for

---

[4] Defendant, at oral argument and in his Reply Brief, cites *Maniaci* v. *Marquette University* (1971), 50 Wis 2d 287 (184 NW2d 168), as holding that there can be no false imprisonment in cases analogous to our facts. In *Maniaci*, the plaintiff was a 16-year-old girl who was prevented by school officials from leaving the university and was committed to Milwaukee County General Hospital under a temporary commitment order pursuant to statute. The Supreme Court reversed a jury verdict for damages for false imprisonment and held that there could be a trial on the issue of abuse of process. However, the facts are clearly distinguishable from our case. The plaintiff in *Maniaci* was a minor and the University officials were acting in *loco parentis*. Moreover, she was *not* prevented from communicating with other individuals to obtain her release. A social worker at the hospital contacted a Leonard McGravey and informed him that Miss Maniaci was being held in the hospital. He, in turn, came to the hospital and was allowed to visit her at 11 p.m. that same evening. Also, she was released at 9 a.m. the next morning. Mrs. Stowers was held for 23 days. Thus, the ability to communicate with others to try to obtain her release was not denied to Miss Maniaci as it was to Mrs. Stowers.

assault and battery.  However, as we pointed out
in Part I, hereof, MCLA § 330.21 (Stat Ann 1963
Cum Supp § 14.811), only authorizes treatment in a
state institution.  As we stated, *supra:*

"Prior to final adjudication by the court, any
treatment given without consent of the patient, other
than that necessary to keep him on the premises and
to prevent his injuring himself or others, is given at
the peril of the superintendent, and may give rise
to liability for assault or for trespass."

The Court of Appeals pointed out (p 126):

"The sanctity of one's body is such that a possible
absence of pain and suffering in its unwarranted
and nonconsensual touching does not eliminate the
need for protection from, or compensation for, such
touching in the absence of a court order or an emer-
gency.  Any submission by plaintiff, no matter how
benign, was not voluntary.  It was not necessary
that she violently resist at every juncture as a pre-
requisite to recovery for assault and battery if her
lack of consent was clearly manifested."

We agree with the Court of Appeals on this point.
Because there was no authority given by the court
order pursuant to MCLA § 330.21 (Stat Ann 1963
Cum Supp § 14.811), there clearly was a nonconsen-
sual touching of the plaintiff.  Given the evidence
of this case (and, indeed, defendant does not con-
tend that he did not order certain medication and
shots to be given plaintiff), there was sufficient evi-
dence that the jury could find that defendant com-
mitted assault and battery on the plaintiff.

## IV.

Defendant contends that the trial court submitted
a different issue to the jury than the Court of Ap-

peals ultimately ruled upon. Basically, defendant contends the trial court gave erroneous instructions to the jury. However, the record before us clearly shows that counsel for both parties had agreed to the instructions the trial court finally gave. Thus, defendant cannot now be heard to object to these instructions. GCR 1963, 516.2. Moreover, the statement of the law given by the trial court to the jury was more favorable to the defendant than that held necessary by the Court of Appeals. Thus, in any case, there was no prejudice shown to defendant.

## V.

Defendant contends that the damages of $40,000 awarded to the plaintiff were excessive. Defendant alleges there was no evidence that plaintiff actually suffered $40,000 worth of damages and that, therefore, the judgment should be reversed on the basis of excessive damages.

In *Fishleigh* v. *Detroit United Railway* (1919), 205 Mich 145, 161, in discussing the question of damages, the Court stated:

"In considering this question the power of the appellate court to act and to vacate judgments or to require an abatement from the amount recovered as a condition of affirmance must not be doubted. That such power rests in this court is beyond question. This power is absolutely essential to the proper administration of justice. Nor in the consideration of the question should the functions of the jury and of the reviewing court be confused. *In personal injury cases the amount of damages is not subject to exact mathematical calculation.* Primarily the question is for the jury and we cannot arbitrarily substitute our judgment for that of the triers of the facts. That would be to usurp the functions of the jury. *But where it clearly and manifestly appears that the ver-*

*dict is the result of prejudice, caprice, passion, partiality, sympathy, or kindred reasons rather than a result of the consideration of the evidence and actual existing conditions, the appellate court in the discharge of its functions is bound to act."* (Emphasis added.)

The Court further said in *Fishleigh* (pp 167, 168):

"But there is no market place where pain is bought and sold. Compensation for suffering must primarily be fixed by the jury with an honest judgment based on the evidence as their guide. If grossly excessive, if the result of prejudice, or passion, or influence other than the evidence in the case, their determination cannot stand in the reviewing court. But that court must find something more tangible than a difference of opinion as to amount before it should vacate a verdict which has the approval of the trial court."

In *Day* v. *Troyer* (1954), 341 Mich 189, 201, 202, the Court, concerning the question of excessive damages, stated:

"In *Torma* v. *Montgomery Ward & Company* [1953], 336 Mich 468, the appellant claimed that the amount of the jury's award was excessive and out of reasonable proportion to the damages shown by the proofs. We there said (p 488):

" 'There is nothing in the record before us to indicate that the jury may have been prejudiced or biased by any occurrence in the course of the trial. It has been repeatedly recognized in prior decisions of this Court that the awarding of damages for pain and suffering rests in the sound judgment of the jury, or of the judge in a case tried without a jury. What was said in *Teeter* v. *Pugsley* [1947], 319 Mich 508, 511, may well be repeated here:

" ' "The amount allowed for pain and suffering must rest in the sound judgment of the trier of the facts. We do not substitute our judgment on this

question unless a verdict has been secured by improper methods, prejudice, or sympathy. No such showing has been made; nor is this portion of the judgment so great as to shock the judicial conscience. *Watrous* v. *Conor* [1934], 266 Mich 397, 401." ' "

This standard has been applied by our Court unvaryingly throughout the years.[5] Each case must, of course, be determined on its own merits. Defendant does not present any evidence of appeals, either by counsel or the trial court, to show sympathy, passion, partiality, or prejudice against defendant. He merely restates some of the facts in the light most favorable to defendant. However, in reviewing such a verdict we must review it in the light most favorable to the plaintiff. We do not believe that the damages of $40,000 awarded by the jury to the plaintiff were excessive. The plaintiff did suffer a great deal of pain and suffering and humiliation. As stated above, it is impossible to put a dollar value on this. Defendant at one point told plaintiff that if she attempted to contact her lawyer or her relatives that she would never see her children again. Statements of this nature, and the fears they would instill, are impossible to determine in an exact amount.

As Chief Justice COOLEY stated almost a century ago in *Van Deusen* v. *Newcomer* (1879), 40 Mich 90, 130:

---

[5] For other cases discussing the problem of excessive jury verdicts see *Wilson* v. *Detroit United R. Co.* (1919), 208 Mich 411, 415; *Schnurr* v. *Detroit United R. Co.* (1923), 222 Mich 591, 598; *Houliston* v. *Grand Rapids* (1923), 224 Mich 501, 503; *King* v. *Neller* (1924), 228 Mich 15, 24; *O'Brien* v. *Union Telephone Co.* (1924), 228 Mich 156, 164; *Bachand* v. *Rosemurgy* (1933), 261 Mich 519, 525; *Pietrantonio* v. *Tonn's Estate* (1936), 278 Mich 535, 540–541; *Reardon* v. *Buck* (1952), 335 Mich 318, 323–324; *McKay* v. *Hargis* (1958), 351 Mich 409, 419; *Sias* v. *General Motors Corporation* (1964), 372 Mich 542, 552; *Stevens* v. *Edward C. Levy Company* (1965), 376 Mich 1, where the Supreme Court reversed an order of *remittitur* granted by the trial court.

"An insane person does not necessarily lose his sense of justice, or of his right to the protection of the law; and when he is seized without warning, and without the hearing of those whom he might believe would testify in his behalf, and delivered helpless into the hands of strangers, to be dealt with as they may decide within the limits of a large discretion, *it is impossible that he should not feel keenly the seeming injustice and lawlessness of the proceeding.*" (Emphasis added.)

The amount awarded was within the range of the evidence, does not "shock our judicial conscience," and should not be set aside. The Court of Appeals is affirmed. Costs to plaintiff.

T. M. KAVANAGH, C. J., and BLACK, ADAMS, T. E. BRENNAN, T. G. KAVANAGH and WILLIAMS, JJ., concurred with SWAINSON, J.