RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FIRST AMERICAN TITLE COMPANY, a California
Corporation; TRANSNATION TITLE INSURANCE
COMPANY, an Arizona Corporation; LAWYERS TITLE
INSURANCE CORPORATION, a Virginia Corporation;
and CHICAGO TITLE INSURANCE COMPANY, a
Missouri Corporation,

>

No. 06-1171

　　　　　　　　　　　*Plaintiffs-Appellants,*

　　v.

MELISSA R. DEVAUGH, in her capacity as the
LAPEER COUNTY REGISTER OF DEEDS; FRAN
FULLER, in her capacity as the EATON COUNTY
REGISTER OF DEEDS; MILDRED DODAK, in her
capacity as the SAGINAW COUNTY REGISTER OF
DEEDS; VIRGINIA MCLAREN, in her capacity as the
TUSCOLA COUNTY REGISTER OF DEEDS; and LINDA
M. LANDHEER, in her capacity as the NEWAYGO
COUNTY REGISTER OF DEEDS,

　　　　　　　　　　　*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70718—John Corbett O'Meara, District Judge.

Argued: December 7, 2006

Decided and Filed: February 22, 2007

Before: BATCHELDER and GRIFFIN, Circuit Judges; PHILLIPS, District Judge.[*]

---

## COUNSEL

**ARGUED:** David A. Ettinger, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan,
for Appellants. Bonnie G. Toskey, COHL, STOKER, TOSKEY & McGLINCHEY, Lansing,
Michigan, for Appellees. **ON BRIEF:** David A. Ettinger, HONIGMAN, MILLER, SCHWARTZ
& COHN, Detroit, Michigan, for Appellants. Bonnie G. Toskey, COHL, STOKER, TOSKEY &

---

[*]The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting
by designation.

1

McGLINCHEY, Lansing, Michigan, Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, Christina M. Grossi, GILBERT, SMITH & BORRELLO, Saginaw, Michigan, for Appellees.

––––––––––––––––

**OPINION**

––––––––––––––––

GRIFFIN, Circuit Judge. The plaintiffs-appellants are four title insurance companies that do business in Michigan: First American Title Company (a subsidiary of First American Corporation), Transnation Title Insurance Company (a subsidiary of LandAmerica Financial Group, Inc.), Chicago Title Insurance Company (a subsidiary of Fidelity National Financial, Inc.), and Lawyers Title Insurance Company (a subsidiary of LandAmerica Financial Group, Inc.), collectively referred to as "First American." The defendants-appellees are the Registers of Deeds of five counties in Michigan: Lapeer, Eaton, Saginaw, Tuscola, and Newaygo, collectively referred to as "the registers."

First American alleges that the Lapeer, Eaton, Saginaw, and Newaygo County registers refuse to provide duplicate records in non-paper formats, or to provide duplicate paper records at a bulk discount, unless First American agrees not to sell or give the duplicate records, unofficial copies of the copies, or the information therein, to anyone else. First American contends that this no-resale condition is an anticompetitive practice that violates the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* First American also alleges that the Tuscola County Register violated the Sherman Act by refusing to provide official title record copies in non-paper format, and by refusing to provide paper copies at a bulk discount; First American does not allege that the Tuscola County Register imposed a no-resale condition on the availability of such copies.

The registers moved to dismiss the Sherman Act claims for failure to state a claim on which relief can be granted, FED. R. CIV. P. 12(b)(6), on the ground that the challenged practices qualify for state-action immunity. The district court granted the registers' motion, and First American appeals. For the reasons that follow, we affirm the dismissal of the Sherman Act claims with regard to the challenged practices of the Tuscola County Register because those practices are covered by state-action immunity from antitrust liability. But we reverse the dismissal of the Sherman Act claims with regard to the challenged practices of the other four county registers and remand for further proceedings consistent with this opinion.

I.

Because First American asserted claims under section 2 of the Sherman Act, 15 U.S.C. § 2, and the United States Constitution, the district court had federal-question jurisdiction under 28 U.S.C. § 1331. The district court had supplemental jurisdiction over First American's state-law claims under 28 U.S.C. § 1367(a) because they "so related" to First American's federal-law claims as to "form part of the same case or controversy." *Id.*; *Davet v. City of Cleveland*, 456 F.3d 549, 553 (6th Cir. 2006). Because the appellants filed timely notices of appeal, we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

In general, a register of deeds ("register") is a government official charged with the tasks of (1) recording all deeds, mortgages, and other instruments that convey an interest in land in the register's county, and (2) maintaining copies of those records for public inspection and reproduction. In Michigan, a register operates only in the county in which she has been elected; each county register therefore has an effective monopoly because obtaining a complete listing of real estate title

documents otherwise entails obtaining title records directly from every person and entity engaged in real estate transactions within the county. As First American explains without contradiction from the registers, this "task would be essentially impossible, since there would be no incentive for individuals to identify themselves or provide documents concerning their transactions to a private party [such as plaintiff title companies], and the cost of collecting this data would be prohibitive."

As a title insurer, First American's business includes compiling, inspecting, and researching each document that is recorded and maintained by the registers in the counties where First American provides title insurance. Based on information in those documents, First American creates, maintains, and provides indices and abstracts of that information. The development of such a document index – called a tract index or a title plant – enables First American to retrieve title documents more quickly and accurately than it could if it used the registers' grantor-grantee indices. This is because a tract index, unlike a register's grantor-grantee index, lists records by parcel of real estate. First American provides its tract indices to title insurance customers and to other companies that do not have their own indices, thus providing a superior source of title information. This enables title insurers and parties to real estate transactions to identify and resolve defects in title.

The Michigan Legislature ("the Legislature") requires registers, upon payment of a fee, to record "reproductions . . . of all deeds, mortgages, maps, and instruments or writings authorized by law to be recorded in his or her office, and left with him or her for that purpose." M.C.L. § 565.491; *see also* M.C.L. § 565.583. Since 1921, the Legislature has authorized the counties by statute

> to purchase or make, establish and maintain a system of abstracts of title to all lands in said county; to make and sell abstracts of title and furnish information concerning the conditions of title to such lands and to charge such fees therefor as shall be from time to time determined by the proper authorities of said counties as hereinafter provided.

M.C.L. § 53.141; *see also* M.C.L. § 565.201(1) (specifying the information that an instrument must contain in order to be recorded with a register of deeds); M.C.L. §§ 565.411 and 565.412 (register may receive and record a sealed, certified copy of any final judgment by a court of competent jurisdiction that affects or relates to the title of real estate that is situated within his county, and it may collect the same fee as charged for recording a conveyance).

Perhaps most relevant, the statute governing reproduction of registers' records, now M.C.L. § 565.551, provides, in full:

> Sec. 1. (1) A register of deeds shall furnish proper and reasonable facilities for the inspection and examination of the records and files in his or her office, and for making memorandums or transcripts from the records and files during the usual business hours, to an individual having a lawful purpose to examine the records and files. However, the custodian of the records and files may make reasonable rules and regulations with reference to the inspection and examination of the records and files as is necessary to protect the records and files and to prevent interference with the regular discharge of the duties of the register of deeds.
>
> (2)      If an individual requests a reproduction of a record or file of a register of deeds, the register of deeds shall do 1 of the following, at the register of deeds' option:
>
> (a)      Reproduce the record or file for the individual pursuant to . . . sections 24.401 to 24.403 of the Michigan Compiled Laws, using a medium selected by the register of deeds. Unless a different fee is provided for by law, the fee for a reproduction

under this subdivision other than a paper copy shall not exceed the reasonable costs to the register of deeds.

(b)      Provide equipment for the individual to reproduce the record or file pursuant to [same statutory sections noted above], using a medium selected by the register of deeds.  Unless a different fee is provided for by law, the fee for a reproduction under this subdivision other than a paper copy shall not exceed the reasonable costs to the register of deeds.

(c)      Authorize the individual to reproduce the record or file on the premises using equipment provided by that individual.  This subdivision does not apply unless the individual requests authorization to reproduce the record or file using equipment provided by that individual.

(3)      A register of deeds may prohibit the reproduction of an instrument temporarily left with the register of deeds to be recorded in the register of deeds' office.

M.C.L. §§ 565.551(2)(a) and (b) incorporate M.C.L. §§ 24.401 through 24.403, which are part of the Records Reproduction Act of 1992.  In turn, M.C.L. § 24.402 provides that a Michigan governmental entity or official may reproduce a record via photograph, photocopy, microreproduction, optical media, data transfer, digitization, digital migration, digital imaging, magnetic media, printing, and any other method or medium that is approved by the Department of History, Arts, & Libraries.  When a register makes a paper copy of a record, M.C.L. §§ 600.2567(1)(b) and (4) authorizes him or her to charge $1.00 per page.

None of these statutory provisions, nor any others identified by the registers, addresses the registers' authority to regulate or restrict private parties' re-sale of record copies or their sale of unofficial copies of those record copies or of information contained therein.

III.

In February 2005, First American filed a three-count complaint in the United States District Court for the Eastern District of Michigan.  Count one alleges that the registers committed antitrust violations under § 2 of the Sherman Act and seeks injunctive relief.  Specifically, First American alleged that the registers used their monopoly power to restrict competition in the provision of title information in their counties by imposing license restrictions and anticompetitive contracts on title companies and, in some cases, by refusing to provide discounted rates for the bulk purchase of title records.  First American alleged that the registers intended these restrictions to hamper the title companies' long-standing practice of re-selling title record copies as part of "title plants" and title searches to companies and to people engaged in real estate transactions.

First American further alleged that the registers abused their positions as public repositories of land title records, in contravention of Michigan statutes that are intended to make title information readily available to buyers and sellers of real estate.  First American contends that the registers' practices have increased title insurance costs for home buyers and sellers and raised barriers to entry into the title insurance market in these five counties, thereby preventing title insurers from offering faster, higher-quality title searches.

Count two is a 42 U.S.C. § 1983 claim alleging that the registers violated First American's federal constitutional rights to procedural due process, substantive due process, and equal protection.  Count three alleges that the registers established and maintained systems of indices or tracts in violation of M.C.L. § 53.141 *et seq.*

The registers moved to dismiss the plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)6) for failure to state a claim on which relief could be granted, and First American filed opposition briefs. In June 2005, the district court dismissed First American's Sherman Act claims (count one) and its federal due-process and equal-protection claims (count two) for failure to state a claim. The district court declined to dismiss First American's state statutory claim (count three) at that juncture.[1]

With regard to count one, the district court held that the registers qualified for state-action immunity from Sherman Act antitrust liability, citing a Michigan statute that granted the registers the general power to make contracts. Relying on *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527 (6th Cir. 2002), the district court concluded that, because the state had granted the registers the general power to contract, the registers had "antitrust immunity in setting terms within a contract."[2]

In June 2005, First American moved for reconsideration with regard to the dismissal of its Sherman Act antitrust claim, contending that the district's court's "ruling on the State Action Immunity doctrine established a new, virtual *per se* immunity rule, which is contrary to controlling Supreme Court and Sixth Circuit precedent and confounds the basic premises of the doctrine." In August 2005, the district court denied reconsideration, stating that

> a tension exists between the United States Supreme Court['s] reasoning in *Community Communications Company, Inc. v. City of Boulder*, 455 U.S. 40 (1982), and the subsequent Sixth Circuit reasoning in *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527 (6th Cir. 2002). Given this tension, the court's conclusion that Defendants' actions are protected by the state action exception to the Sherman Act is certainly debatable. However, the court's decision did not constitute palpable error. It was an attempt to faithfully construe the broad language used in a recently published Sixth Circuit decision. Plaintiffs['] arguments, which are quite persuasive, are best directed at the Sixth Circuit if the Plaintiffs seek appellate review and further explanation of that court's reasoning in *Michigan Paytel*.

In January 2006, First American and the other plaintiffs filed a timely notice of appeal with regard to the dismissal of their Sherman Act claims.

IV.

We review de novo a dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *S.E. Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 671 (6th Cir. 2006) (citation omitted). To survive the 12(b)(6) motion, First American's complaint must allege facts which, if proved, would entitle it to relief. *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45 (1957)). We construe the complaint in the light most favorable to First American, accept its factual allegations as true, and determine whether it can prove no set of facts in support of its claims that

---

[1] The district court rejected the registers' abstention and preclusion arguments, and the registers have not appealed.

[2] With regard to count two's procedural due-process claim, the district court held that First American failed to establish a liberty or property interest in the ability to purchase public records at a bulk rate with the right to resell them. With regard to the substantive due-process and equal protection claims, the district court held that the registers' practices bore a rational relation to the legitimate state interest in maintaining and increasing revenue from public record sales. Regarding count three, the district court denied summary judgment, finding "a genuine issue of material fact as to whether the Registers are indeed illegally maintaining a system of abstract of title" in violation of Michigan statute. The district court later issued a separate opinion dismissing count three, holding that the relevant state statute did not provide a private right of action. First American has not appealed the dismissal of counts two and three.

would entitle it to relief. *Id.* "Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.* at 671-72 (citation omitted).

V.

First American brings its claim under § 2 of the Sherman Act, which provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2. The sole issue on appeal is whether these registers' challenged practices are exempt from the Sherman Act under the "state action" immunity doctrine, which was first set forth in *Parker v. Brown*, 317 U.S. 341 (1943). *Parker* held that

> nothing in the language of the Sherman Act or in its history . . . suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

> The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The act is applicable to "persons" including corporations . . . .

> There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only "business combinations." [citations to Cong. Rec. omitted] That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history.

*Parker*, 317 U.S. at 351 (citations omitted). The *Parker* doctrine "exempts 'anticompetitive conduct engaged in as an act of government by the state as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service' from Sherman Act control." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 440-41 (6th Cir. 2006) (quoting *City of No. Olmsted v. Greater Cleveland Reg'l Transit Auth.*, 722 F.2d 1284, 1287 (6th Cir. 1983) (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 413 (1978) (Brennan, J.[3]) ("*Lafayette*"))), *cert. granted on other grounds*, — U.S. —, 127 S. Ct. 852 (2007).

The Supreme Court later "established a two-part test for determining whether [*Parker* state-action immunity] saves a state statute [or a county practice] from preemption by the Sherman Act: 'First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself.'" *Trident Int'l Corp. v. Cmnwlth. of Ky.*, 467 F.3d 547, 554-55 (6th Cir. 2006) (quoting *Calif. Retail Liquor Dealers Ass'n*

---

[3]In Parts II and III of his opinion, which we quote and rely on here, Justice Brennan spoke only for four Justices: himself and Justices Marshall, Powell, and Stevens. Several of the registers attack *Lafayette* as "merely a plurality opinion having no precedential force." Their attempt to escape *Lafayette* is unavailing. As the Supreme Court noted twenty-five years ago, the *Lafayette* plurality's "standard has since been adopted by a majority of the Court." *City of Boulder*, 455 U.S. at 51 (citing *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 439 U.S. 96, 109 (1978) and *Midcal*, 445 U.S. at 105).

*v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) ("*Midcal*")); *see also Brentwood*, 442 F.3d at 441. Both *Midcal* elements "are directed at ensuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992) ("*Ticor*") (citing *Patrick v. Burget*, 486 U.S. 94, 100 (1988)).

> The Supreme Court has held that *Midcal*'s second prong does not apply to municipalities:
>
> [T]he requirement of active state supervision [*Midcal*'s second prong] serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy. In *Midcal* we stated that the active state supervision requirement was necessary to prevent a State from circumventing the Sherman Act's proscriptions "by casting . . . a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S., at 106 . . . . Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy [*Midcal*'s first prong]. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46-47 (1985) ("*Hallie*").

Finally, like other judicially-imposed exemptions from the antitrust laws, the state-action immunity doctrine must be narrowly construed. *Brentwood*, 442 F.3d at 441 (citing *Ticor*, 504 U.S. at 636) ("[W]e have held that state-action immunity is disfavored . . . .")).

## VI.

We hold that the challenged practices of the Saginaw County, Eaton County, Lapeer County, and Newaygo County registers do not qualify for *Parker* state-action immunity because they are not "clearly articulated and affirmatively expressed as state policy," *Midcal*, 445 U.S. at 105.

First, the registers do not claim that the state of Michigan *requires* them to follow the challenged practices. The registers do not claim that a state statute or regulation requires them to prohibit purchasers from re-selling or otherwise providing title record copies or information to other private parties.[4] They do not claim that a state statute or regulation prohibits them from offering a bulk discount on paper copies without a no-resale restriction. Nor do they claim that a state statute or regulation prohibits them from making title records available in more convenient and readily searchable non-paper formats, such as microfiche or digital images or information on a compact disc or "memory key," without a no-resale restriction.

---

[4] As a condition for continuing to sell title records to First American, the Lapeer register required First American to sign an agreement that prohibited it from using the documents for any purpose other than internal underwriting. First American signed the agreement for 2001 but refused to renew for 2002. The Lapeer register then refused to sell title records to First American at a bulk discount and in non-paper form as it had previously done. Beginning in 2003, the Eaton register required First American to sign a similar agreement and likewise stopped providing title records at a bulk discount and in non-paper formats when First American refused to agree to the restrictions on resale. The Newaygo and Saginaw registers took similar measures beginning in December 2004 and January 2005, respectively.

Nonetheless, in order to establish that the challenged practices are "clearly articulated and affirmatively expressed as state policy" per *Midcal*, the registers need not show that the Legislature *required* the practices. *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 414 n.25 (6th Cir. 2006) ("With regard to the first prong of the *Midcal* test, we do not require explicit authorization . . . .") (citations and quotation marks omitted).[5]

In *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), the Supreme Court stated that "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe[,] is whether the activity is required by the State acting as sovereign." *Id.* at 790. The Supreme Court later cited *Goldfarb* with approval in *Midcal*, 445 U.S. at 104. The Supreme Court has since clarified that:

> *Goldfarb*, however, is not properly read as making compulsion a *sine qua non* [of] state action immunity. In that case, [it was undisputed that] the Virginia State Bar, a state agency, compelled Fairfax County lawyers to adhere to a minimum fee schedule. 421 U.S., at 776-78 . . . . The *Goldfarb* court therefore was not concerned with the necessity of compulsion – its presence in the case was not an issue. The focal point of the *Goldfarb* opinion was the *source* of the anticompetitive policy, rather than whether the challenged conduct was *compelled*. The Court held that a State Bar, *acting alone*, could not immunize its anticompetitive conduct. Instead, the Court held that private parties, acting alone, were entitled to *Parker* immunity only if the State "acting as sovereign" intended to displace competition. 421 U.S., at 790 . . . .
>
> Although *Goldfarb* did employ language of compulsion, it is beyond dispute that the Court would have reached the same result had it applied the two-pronged test later set forth in *Midcal*. . . . Although we recognize that the language in *Goldfarb* is not without ambiguity, we do not read that opinion as making compulsion a prerequisite to a finding of state action immunity.

*Southern Motor Carriers Rate Conference, Inc. v. U.S.*, 471 U.S. 48, 105 S. Ct. 1721, 1728-29 (1985) ("*Southern Motor*"). In short, "a state policy that expressly *permits*, but does not compel, anticompetitive conduct may be 'clearly articulated' within the meaning of *Midcal*." *Southern Motor*, 105 S. Ct. at 1729. Thus, the registers "need not point to a specific, detailed legislative authorization for [their] challenged conduct." *Southern Motor*, 105 S. Ct. at 1730 (citation and internal quotation marks omitted). But the registers must show that "the State as sovereign [the Legislature] clearly intends to displace competition in a particular field with a regulatory structure . . . ." *Id.*

The parties' disagreement can be seen as a divergence on how to define the relevant "particular field" in which the Legislature "clearly intend[ed] to displace competition," *id.* As noted above, it is effectively impossible for private parties (such as the plaintiff companies) to induce the parties to all real estate transactions in a county to provide them with grantor/grantee and other title information. And all parties to a real estate transaction must report the transaction and record the change of title with the register, who alone keeps the original documents thus generated. The Legislature understood these obvious and uncontested realities when it enacted the legislation that defined the powers and responsibilities of the registers. Therefore, we conclude that for purposes

---

[5]On a related note, First American cannot defeat state-action immunity by showing that the registers' imposition of a no-resale condition was a misuse of or exceeded their legal authority. *Stringham v. Hubbard*, No. Civ-S-05-0898, – F. Supp. 2d –, 2006 WL 3053079, at *3 (E.D. Cal. Oct. 26, 2006) (U.S.M.J.) (citing *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 402 & n.10 (9th Cir. 1991)), *R&R adopted*, – F. Supp. 2d –, 2006 WL 3498405 (E.D. Cal. Dec. 5, 2006) (U.S.D.J.).

of the Sherman Act, the Legislature intended that the registers have a monopoly on (1) mandatory acquisition of real estate transaction information from the parties to the transaction, and (2) recordation of the transaction and possession of the *original, official* title documents thus generated. We hold that the Legislature "clearly intend[ed] to displace competition" with the registers to that extent.

However, we cannot conclude from this that the Legislature further intended to displace competition in the provision of *unofficial duplicate* title documents or title *information*, which is all that First American seeks to do. On the contrary, if the Legislature wished to grant the county registers a broader monopoly – a monopoly on the provision even of duplicate title documents or mere title *information* – it could have done so. It has not.

This does not yet conclude the inquiry in First American's favor. The question remains, even though the Legislature has not *expressly* given the registers a monopoly on the provision of duplicate title documents and title information, does such a monopoly "logically result from" the powers that the State *did* expressly give the registers? Put another way, is the imposition of a no-resale condition by these registers a "foreseeable result" of the monopoly or anticompetitive powers that the Legislature did expressly give the registers?

The "foreseeable result" and "logical result" formulations stem from the Supreme Court's opinion in *Hallie*. There, the Supreme Court considered a Wisconsin statute that authorized cities to build, add to, alter, and repair sewage systems, including the power to "describe with reasonable particularity the district to be served." *Hallie*, 471 U.S. at 41. The Wisconsin Legislature had also enacted a statute providing that a city operating a public utility "may by ordinance fix the limits of such service in unincorporated areas. Such ordinance shall delineate the area within which service will be provided and the municipal utility shall have no obligation to serve beyond the area so delineated." *Id.* A third Wisconsin statutory provision authorized the Department of Natural Resources ("DNR") to require a city to construct its sewage system so that other areas could connect to it. *Id.* It also provided, however, that the DNR's order would be void if the area seeking to connect to the sewer system refused to be annexed by the municipality; in other words, the Wisconsin Legislature effectively authorized municipalities to condition connection to its sewage system on an agreement to be annexed. *Id.*

The city of Eau Claire refused to provide sewer service to neighboring townships unless they agreed to be annexed, and the townships contended that this violated the Sherman Act. The Supreme Court held that the city's practice qualified for state-action immunity from antitrust liability:

> The Towns contend that these statutory provisions do not evidence a state policy to displace competition in the provision of sewage services because they make no express mention of anticompetitive conduct. [But] . . . the statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a foreseeable result of empowering the City to refuse to serve unannexed areas. . . . [I]t is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.

*Hallie*, 471 U.S. at 41-42 (internal citations omitted).

Here, by contrast, it was decidedly *not* foreseeable that the powers expressly granted to the registers would result in any of these four registers' challenged practices. In reaching this conclusion, we have considered Michigan statutes governing county powers generally, statutes governing access to public records, and statutes governing county register records specifically.

First, the Legislature authorized and required the registers to record deeds and related instruments that affect or pertain to real property title – such as mortgage satisfactions,[6] tax liens or certificates,[7] and court judgments[8] – and to store the *original* records thus generated. *See* M.C.L. § 53.94 (providing, in pertinent part, "The board of supervisors of each county shall, from time to time, provide suitable books, at the expense of the county, for the entering and recording of all deeds and matters required by law to be entered and recorded by the register of deeds."). The Legislature also authorizes county boards to authorize registers to make copies of the records and keep the copies on hand. *See* M.C.L. § 691.1102 (if the county board of commissioners instructs the register to do so, the register may make copies of the original records in her possession, keeping one copy in her office, and storing one copy in a separate building).

As the Lapeer register correctly points out, "Based on this myriad of statut[es], the register is *the* only official with the authority to store and make a copy from its [original] record . . . . The Plaintiffs, as with all the public, may obtain a copy of the register's record . . . , but they can never store or copy *the* official record . . . ." But none of these powers and obligations of the register foreseeably or logically results in the registers conditioning non-paper copies or bulk-discounted paper copies on a no-resale restriction – let alone on the sale of *unofficial (uncertified) copies* (i.e. "copies of copies") or of the title information contained therein.

Second, the Legislature authorized the registers to "make reasonable rules and regulations with reference to the inspection and examination of the records and files as is necessary to protect the records and files and to prevent interference with the regular discharge of the duties of the register of deeds." M.C.L. § 565.551(1). The registers present no evidence or reason to believe that the sale of unofficial copies of the certified copies, or the sale of the information contained therein, would somehow affect the integrity of the originals or interfere with the registers' discharge of their duties. Therefore, we hold that it is not foreseeable that the powers granted in M.C.L. § 565.551(1) would logically result in the challenged practices. *Cf. Lapeer Cty. Abstract & Title Co. v. Lapeer Cty. Register of Deeds*, 691 N.W.2d 11, 16 (Mich. Ct. App. 2004) ("MCL 565.551(1) generally pertains only to the in-office inspection of records, [not] . . . the reproduction of those records. More specifically, the 'reasonable rules and regulations' language . . . only pertains to the inspection and examination of records, not their reproduction and distribution. . . . It has nothing to do with the making of contracts for the sale of copies, let alone entering into contracts that provide only for the restricted use of such copies.").

Third, when a party requests a copy of a record held by a register, the Legislature authorizes the register to choose whether to reproduce the record itself or provide equipment for the requestor

---

[6] *See* M.C.L. § 565.42 ("Any mortgage shall also be discharged upon the record thereof by the register of deeds, in whose custody it shall be, whenever there shall be presented to him a certificate executed by the mortgagee . . . specifying that such mortgage has been paid, or otherwise satisfied or discharged; or upon the presentation to such register of deeds of the certificate of the circuit court . . . certifying . . . that said mortgage has been duly paid, or upon the presentation to such register of deeds of a certificate of the register in chancery of the county . . . certifying that a decree of foreclosure of any such mortgage has been duly entered in his office, and that the records in his office shows [sic] that such decree has been fully paid and satisfied.").

M.C.L. § 565.43 provides, in part, "Every certificate described in [M.C.L. § 565.42], and the proof or acknowledgment of the certificate, shall be recorded at full length, and a reference shall be made to the book and page containing the certificate, in the minute of the discharge of the mortgage made by the register upon the mortgage."

[7] *See* M.C.L. § 211.135 (before recording deed or contract, register must obtain certificates confirming that taxes have been paid and all tax liens satisfied on the property for past five years).

[8] *See* M.C.L. §§ 600.6055(1) and (2) (whenever real estate is sold by execution of a judgment, the executing officer must file a certificate of sale with the county register within ten days, and the register must record it).

to make the reproduction. *See* M.C.L. §§ 565.551(2)(a) and (b). It is not foreseeable that granting the registers this discretion would logically result in the challenged practices.

Fourth, when a party requests a copy of a record held by a register, the Legislature authorizes the register to choose whether to reproduce the record on paper or in some other format. *See* M.C.L. § 565.551(2)(a) (register may "[r]eproduce the record or file for the individual pursuant to . . . [M.C.L. §§ 24.401 - 24.403], using a medium selected by the register of deeds."). That is, a register may permissibly have a policy of not making non-paper copies available to anyone. It is not foreseeable, however, that merely granting registers discretion as to the medium of the copies would result in the registers discriminating between purchasers who wish to use the information in the marketplace and purchasers who do not. That is, the discretion to provide all purchasers with only paper copies does not logically result in providing *some purchasers* with non-paper copies but denying them to others who might compete with the registers in the provision of title information.

Fifth, the Legislature authorizes the registers to charge a statutorily fixed fee for each copy. For paper copies, the registers may charge $1.00 per 8.5-inch by 11-inch single-sided page, M.C.L. §§ 600.2567(1)(b) and (4), and, for non-paper copies, the register may charge enough to recoup its "reasonable costs," M.C.L. §§ 565.551(2)(a) and (b). It is not foreseeable that granting a register the discretion to charge a fee to cover its costs would result in the register refusing to make non-paper copies, despite payment of the fee, unless the purchaser agreed to relinquish his right to re-sell the copies or the information they contain.

Sixth, in 1996, the Legislature enacted the Enhanced Access to Public Records Act, M.C.L. §§ 15.441 - 15.443 ("the enhanced access act"). The enhanced access act provides that, "[u]pon authorization of the governing body of the public body, [a public body may] provide enhanced access for the inspection, copying, or purchasing of a public record that is not confidential or otherwise exempt by law from disclosure." M.C.L. § 15.443(1)(a). The act defines enhanced access as "a public record's immediate availability for public inspection, purchase, or copying *by digital means*," and it cautions that "[e]nhanced access does not include the transfer of ownership of a public record." M.C.L. § 15.442(a) (emphasis added). The act further provides that if a public body does provide enhanced (i.e., digital) access to a public record, it may "charge a reasonable fee established by the public body's governing body" for doing so, M.C.L. § 15.443(1)(b), which is defined as "a charge calculated to enable a public body to recover over time only those operating expenses directly related to the public body's provision of enhanced access." M.C.L. § 15.442(g).

We first note our uncertainty with regard to whether the enhanced access act even applies to county registers.[9] The enhanced access act claims blanket coverage of all entities that are considered public bodies and all records that are considered public records under the Michigan Freedom of Information Act ("FOIA"), *see* M.C.L. § 15.442(e) and (f).[10] By contrast, the Inspection of Records Act, M.C.L. § 565.551, by its terms, applies specifically and only to county registers.

This difference in the two statutes' coverage is significant. "One of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one." *United States v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004) (citations omitted); *see also Simpson*

---

[9] The Michigan courts have not yet had occasion to provide guidance on this issue.

[10] The Michigan FOIA definition of public body excludes the judiciary but includes every state officer, employee, or agency in the executive branch, except the Governor and Lieutenant Governor and their executive offices and executive office employees; every agency or other body in the legislative branch; and every county, regional, or local body or agency. M.C.L. §§ 15.232(i-v). It defines public record as "a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created" and defines "writing" to include every "means of recording or retaining meaningful content." M.C.L. §§ 15.232(e) and (h).

*v. United States*, 435 U.S. 6, 15 (1978)[11] (referring with approval to "the principle that gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern, *even if the general provision was enacted later*") (emphasis added).[12] This is true even when there is no direct conflict between the general statute and the specific one. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("A general statutory rule usually does not govern unless there is no more specific rule.") (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

Because the question of whether the enhanced access act applies to county registers is a question of state law, we note that the Michigan courts follow this same rule of statutory construction. *See People v. Bewersdorf*, 450 N.W.2d 271, 272 (Mich. Ct. App. 1989) (holding that the Motor Vehicle Code's specific sentencing scheme applicable to convictions for operating under the influence of intoxicating liquor "prevails to the exclusion of the general habitual-offender statute"), *aff'd in pt & rev'd in pt on other grounds*, 475 N.W.2d 231 (Mich. 1991) (reading general provision and specific provision not to conflict with one another). It seems, then, that the enhanced access act may not apply to county registers.[13]

Even assuming, without deciding, that the enhanced access act applies to county registers, it does not help the registers' case for state-action immunity.[14] The registers emphasize that "the Enhanced Access to Records Act . . . permits, but does not mandate Counties to provide 'enhanced access' to public records." That is correct,[15] but irrelevant. It does not change the fact that it is not reasonably foreseeable that simply allowing a register to make records available for digital copying would lead a register to refuse to do so unless the purchaser gives up his right to sell unofficial copies of those copies or the information therein.

---

[11] *Simpson* was superseded by statute, but on other grounds. *See United States v. Moore*, 917 F.2d 215 (6th Cir. 1990).

[12] *See, e.g., Sherrod v. Genzyme Corp.*, 170 F. App'x 375, 378 (6th Cir. 2006) ("M.C.L. § 445.774a(1)'s specific authorization of non-compete agreements trumps the other statutes' inclusion of such agreements within their general prohibition on 'consideration' as a condition of employment.").

[13] The Lapeer register admits as much: "Actually, the more specific statute, MCL 565.551, controls. * * * MCL 15.443 is not relevant."

[14] Conversely, we are not persuaded by First American's argument that the enhanced access act shows that the registers are *not* entitled to state-action immunity.

First American asserts, "The Enhanced Access Act not only did not contemplate pricing structures to punish competition . . . it prohibits them." But the enhanced access act does no such thing; it authorizes public bodies to provide copies to *other public bodies* free of charge, not to private parties free of charge, and it says nothing about prohibiting or allowing private parties to re-sell copies or the information therein.

First American also asserts, "The language in the Enhanced Access Act relating to pricing confirms that restrictions against resale not only were not contemplated by the Legislature, but are contrary to the goals of the Act. This Act limits the fees public bodies may charge to 'an amount that enables the public body providing access to or output from its system to recover over time its operating expenses directly related to providing access to output from its system to a third party.'" We fail to see how a limitation on the fees that public bodies may charge for digital copies evinces an intent to prohibit public bodies from imposing no-resale conditions on private purchasers of those copies.

[15] The last subsection of the act provides: "This act does not require a public body to provide enhanced access to a specific public record if that public body has not established an enhanced access policy in accordance with subsection (5) with respect to that specific record." M.C.L. § 15.443(6).

Several of the registers seize upon the enhanced access act's statement that "[e]nhanced access does not include the transfer of ownership of a public record." Registers Fuller, McLaren, and Landheer argue, "Plaintiffs ignore that the Enhanced Access to Records Act not only foresees such restrictions on sale or transfer, but, actually, specifically contemplates them." They also argue that "the requestor does not, by statute, secure an ownership interest in the documents, and the requestor thus cannot convey or sell to others what it does not own." But this provision of the enhanced access act has nothing to do with registers' right to restrict the sale or transfer of certified copies (provided by a register), let alone the sale or transfer of uncertified "copies of copies" (made by a title insurance company from the certified copy) or the title information therein. M.C.L. § 15.442(a)'s caveat about ownership of public records obviously refers to the *original* public record, which remains owned and possessed by the public body, regardless of how many digital copies of the record are sold. First American uses in the marketplace only what it owns – not the original public record, but unofficial "copies of copies" and the title information contained therein.

The registers also attempt to bolster their case for state-action immunity by reference to yet another provision of the enhanced access act. M.C.L. § 15.443(d) authorizes public bodies to

> [p]rovide *another public body* with access to or output from its geographical information system for the official use of that other public body, without charging a fee to that other public body, if the access to or output from the system is provided in accordance with a written intergovernmental agreement that contains all of the following:
>
> (i)     A statement specifying that the public body receiving access to or output from the system without charge is prohibited from providing access to the system's output to a third party unless that public body does both of the following:
>
> (A)     Collects from the third party a fee described in subsection (2), or waives that fee in accordance with the written terms of the intergovernmental agreement.
>
> (B)     Conveys to the providing public body that [a] portion of any fee collected under subsection (2) that is directly attributable to the operating expenses of the providing public body in furnishing the output from the system to the third party.
>
> . . . .
>
> (iii)     A statement specifying the portion of any fee collected under subsection (2) and collected from a third party that the receiving public body shall convey to the providing public body.

*Id.* (emphasis added). The registers' reliance on this provision is misplaced. The existence of this provision actually undermines the registers' argument that the Legislature "specifically contemplate[d]" restrictions on *private purchasers'* sale or transfer of uncertified record copies ("copies of copies") or the title information therein. The Legislature authorized public bodies to enter into such agreements only with *other public bodies.* That is why M.C.L. § 15.443(d) repeatedly refers to *intergovernmental* agreements, and *only* intergovernmental agreements, through which a public body can obtain geographical information without a fee if it promises either not to resell the information or to turn over part of any monies it receives by reselling the information.

The existence of M.C.L. § 15.443(d) shows that, when the Legislature wished to authorize a public body to impose a no-resale condition to the provision of public record copies, the Legislature knew how to do so and did so explicitly. *Cf. Marx v. Centran Corp.*, 747 F.2d 1536, 1545 (6th Cir. 1984) (after noting that 12 U.S.C. § 93(a) contained an express cause of action and § 93(b) did not, this court remarked, "[t]his difference between the two subsections leads to the

conclusion that 'when Congress wishes to provide a private damages remedy, it knew how to do so and did so expressly.'") (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979)).

If anything, the registers' case is undermined by the fact that the Legislature chose *not* to enact a similar provision authorizing public bodies to impose a no-resale condition on the provision of public record *to private parties.* This reasoning comports with the long-established canon of statutory construction, *expressio unius est exclusio alterius*, "the mention of one thing implies the exclusion of another." *See Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) ("Under the *expressio unius* principle, '[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'") (quoting *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974)).[16] The Michigan courts also follow this canon of construction. *See People v. Jahner*, 446 N.W.2d 151, 155 n.3 (Mich. 1989) (citing, *inter alia*, *Stowers v. Wolodzko*, 191 N.W.2d 355 (Mich. 1971)).

In any event, the rationale of M.C.L. § 15.443(d) is inapposite when the recipient of public records is a private party. That provision contemplates that a public body give up its right to resell public record information (or agree to share the fee from such resale) precisely because the public body received the information *free of charge.* Here, by contrast, First American is not entitled to receive, and does not seek to receive, title record copies for free in any quantity or format.

Moreover, the registers should *hope* that the enhanced access act does not apply to them because one of its provisions recognizes and assumes that private parties sell information obtained from digital copies of public records. Section 4 provides that "[a]n individual elected or appointed to a board of governing body of a city, village, township or county *shall not have an ownership interest in*, or accept compensation from, *a person who sells information that is obtained from a public record* of that city, village, township or county." M.C.L. § 15.444 (emphasis added). As First American points out, one can obtain an "ownership interest" in a private company, but not in a local or county government.

Finally, even if the enhanced access act does not apply to county registers, its fourth section still undermines the registers' claim that the Legislature contemplated restrictions on the resale of public record copies or information contained therein. At least for digital copies provided under the enhanced access act, the Legislature contemplated precisely the opposite, i.e., that private parties would buy copies and sell them (or their information) as they have long done.

The district court began its Sherman Act discussion by correctly noting that the state Legislature's "intention to authorize [the challenged] anticompetitive behavior need not be express in a statute. It is enough that it is the foreseeable result of acts [that] the statute [expressly] authorizes." June 13, 2005, Dist. Ct. Op. at 7 (citing *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 373 (1991) and *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 535-36 (6th Cir. 2002)). But the district court did not meaningfully discuss, let alone apply, the standard for state-action immunity enunciated by the Supreme Court in *Omni* and *Hallie* and by this court in *Michigan Paytel*.[17]

Namely, the district court did not independently determine whether, *for purposes of the Sherman Act*, the challenged anticompetitive practices were a foreseeable or logical result of the statutory authority that the Legislature did give the registers. Rather, the district court simply followed a Michigan Court of Appeals decision that did not involve the Sherman Act or any antitrust

---

[16]*See, e.g., Cavanaugh v. Cardinal Local Sch. Dist.*, 409 F.3d 753, 756 (6th Cir. 2005) ("Applying the canon of *exclusio unius est exclusio alterius* . . . we conclude . . . .").

[17]The district court did not cite *Southern Motor*, 471 U.S. 48 (1985).

statute, *Lapeer Cty. Abstract & Title Co. v. Lapeer Cty. Register of Deeds*, 691 N.W.2d 11 (Mich. Ct. App. 2004). As the Michigan Court of Appeals remarked, "The complaint also alleged an antitrust violation and a violation of federal constitutional rights contrary to 42 USC 1983, but *those claims are not at issue in this appeal.*" *Id.*, 691 N.W.2d at 14 n.2 (emphasis added).

The district court uncritically adopted *Lapeer* as follows:

The Michigan Inspection of Records Act provides that the Registers have the option to produce requested records using a medium the Registers select. M.C.L. § 545.551 [sic, § *565.551(2)*]. The Registers can also make reasonable regulations regarding their examination. *Id.* The Registers argue that these statutory provisions give them the authority to make conditions on bulk sales of records. However, the Michigan Court of Appeals expressly rejected the notion that M.C.L. § 545.551 [sic, § 565.551] gave Registers the authority to enter contracts that restrict the resale of public records. ... At the same time, [however,] the court found that this statute did not prohibit Registers from entering into such contracts. [citation omitted] The Court held that Registers have the ability to restrict the dissemination of information provided in bulk form under a county government's general power to make contracts and a county's general power to manage its own business affairs. *Id.* at 176-77 (citing M.C.L. §§ 45.3[18], 46.11[19]). The court noted,

> Simply as an exercise of the general power to contract, defendant has the authority to propose and enter into contracts in which it provides concessions, such as a reduced bulk rate fee or copies in microfilm form, in return for a purchaser agreeing to special conditions, such as a restriction on the use of the copies provided. Such a quid pro quo arrangement is a usual and inherent part of the contracting process. Further, the negotiation of such contracts is within the broad statutory grant of authority provided for the care and management of the property and business concerns of a county.

*Id.* This court will not question the judgment of the Michigan Court of Appeals regarding the statutory authority under which the Registers are acting when they make conditions on bulk sales. The very policy reason behind the *Parker* [state-action] exception, respect for state sovereignty, cautions the court against delving too deeply into state law matters to determine whether the *Parker* exception applies.

June 13, 2005, Dist. Ct. Op. at 7-8.

If this were a question of state law, the federal courts would indeed be obligated to defer to the decisions of the Michigan courts. But we are not deciding a question of state law; as noted above, First American has not appealed the dismissal of its state-law claim. A state court's opinion

---

[18]M.C.L. § 45.3 is extremely general, providing, "Each organized county shall be a body politic and corporate, for the following purposes . . . to make all necessary contracts, and to do all other necessary acts in relation to the property and concerns of the county." This provision does not refer to the register of deeds, let alone to the provision of duplicate title records or title information.

[19]M.C.L. § 46.11(l) provides that a county board of commissioners may "[r]epresent the county and have the care and management of the property and business of the county if other provisions are not made." M.C.L. § 46.11(m) provides that a county board of commissioners may "[e]stablish rules and regulations in reference to the management of the interest and business concerns of the county as the board considers necessary and proper in all matters not especially provided for in this act or under the laws of this state." These provisions do not refer to the register of deeds, let alone to the provision of duplicate title records or title information.

on an issue of federal law – or, in our case, a state court's opinion on a state-law issue that also arises in federal law – is entitled to no deference whatsoever. *See Wallace v. Cranbrook Educ. Cmty.*, No. 05-73446, – F. Supp. 2d –, 2006 WL 2796135, *6 (E.D. Mich. Sept. 27, 2006) ("Although federal courts must defer to a state court's interpretation of its own law, federal courts 'owe no deference' to a state court's interpretation of federal law.") (quoting *United States v. Miami Univ.*, 294 F.3d 797, 811 (6th Cir. 2002)); *accord Hawkman v. Parratt*, 661 F.2d 1161, 1166 (8th Cir. 1981).[20]

*As a matter of Michigan law* as interpreted by the Michigan Court of Appeals, a county's state-granted general powers to make contracts and manage its own business affairs implicitly encompass the power to condition bulk public record sales on relinquishment of the right to re-sell the records. That tells us nothing, however, about whether a county's exercise of that latter power qualifies for state-action immunity from Sherman Act liability. *See, e.g.,* Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application 455 (2d ed. 2000) ("We would therefore disagree . . . with decisions holding . . . that the bare power to make contracts implies the power to enter into anticompetitive exclusive arrangements [for purposes of federal antitrust law].").

Because the Michigan Court of Appeals was interpreting *only Michigan law* in *Lapeer County Abstract*, it was not bound by the principles and presumptions that govern federal antitrust law. Following the Supreme Court, this court has emphasized that the state-action immunity doctrine, like other judicially imposed exemptions from the antitrust laws, must be narrowly construed. *Brentwood*, 442 F.3d at 441 (citing *Ticor*, 504 U.S. at 636). The Michigan Court of Appeals labored under no such stricture when it decided what implicit powers can be inferred from the registers' explicit powers under Michigan law.

Moreover, in the Sherman Act context, the Supreme Court has made clear that a "neutral" state view towards a state subdivision's allegedly anticompetitive conduct is insufficient to trigger state-action immunity. This, too, is a rule of law that did not apply to the Michigan Court of Appeals's interpretation of Michigan law in *Lapeer County Abstract*.

The Supreme Court has provided a helpful contrast between a "neutral" state view of anticompetitive conduct and a state's requirement or endorsement of the anticompetitive conduct. Considering whether a Mississippi agency's setting of transportation prices was exempt from the Sherman Act, the Supreme Court explained,

> The Mississippi statute stands in sharp contrast to the Colorado Home Rule Amendment, which we considered in *Community Communications Co. v. Boulder*, 455 U.S. 40 . . . (1982). In *Boulder*, the State Constitution gave municipalities extensive powers of self-government. *Id.*, at 43-44 . . . . Pursuant to this authority, the city of Boulder prohibited a cable television company from expanding its operations. The Court held that because the Home Rule Amendment did not evidence an intent to displace competition in the cable television industry, *id.* at 55 . . . , Boulder's anticompetitive ordinance was not enacted pursuant to a clearly articulated state policy. This holding was premised on the fact that Boulder, as a "home rule municipality," *was authorized to elect free-market competition as an alternative to regulation. Id.* at 56 . . . .
>
> In this case, on the other hand, the Mississippi Public Service Commission *is not authorized to choose free-market competition.* Instead, it is required to prescribe

---

[20] *See Wayne v. Vill. of Sebring*, 36 F.3d 517, 526 (6th Cir. 1994) ("We reject the state court of appeals' interpretation of federal law.").

rates for motor common carriers on the basis of statutorily enumerated factors. [state statutory citation omitted] These factors bear no discernible relationship to the prices that would be set by a perfectly efficient and unregulated market. Therefore, the Mississippi statute clearly indicates that the legislature intended to displace competition in the intrastate trucking industry with a regulatory program.

*Southern Motor*, 471 U.S. at 65 n.25, 105 S. Ct. at 1731 n.25 (emphasis added).

The registers' situation here is akin to the situation in *City of Boulder*: Michigan statute gives the counties the power to make contracts, but it leaves the counties free to allow competition in the provision of duplicate title records and the information contained therein. In other words, Michigan statutory law leaves the counties free to provide duplicate title records to purchasers, in any format or quantity, without mandating that the purchasers give up their right to re-sell the official copies (or to sell unofficial copies of those copies, or the information therein). Unlike *Hallie*, the state statutes do not "plainly show that 'the legislature contemplated *the kind of action complained of.*'" *Hallie*, 471 U.S. at 44 (quoting *Lafayette*, 435 U.S. at 415). So far as Michigan statutory law shows, the Legislature is neutral towards the anticompetitive condition these registers have imposed on purchasers of title records. The Legislature does not contemplate the displacement of competition in the unofficial-copy / title information market any more than it contemplates free competition in that secondary market.

This is fatal to the Rule 12(b)(6) motion to dismiss for failure to state a claim with regard to these four registers because the Supreme Court holds that "plainly the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the . . . actions challenged as anticompetitive." *City of Boulder*, 455 U.S. at 55. Contrary to the district court's conclusion, granting counties the general power to contract or manage their business affairs cannot imply state authorization to impose this anticompetitive restriction: "[a]cceptance of such a proposition – that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances – would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require." *Id.* at 56.[21]

The district court appears to have acknowledged that the Supreme Court's decision in *City of Boulder* rendered the registers ineligible for state-action immunity:

In *Community Communications Company, Inc. v. City of Boulder*, 455 U.S. 40 (1982), the Supreme Court held that the City of Boulder was not immune to the Sherman Act when its alleged anticompetitive actions were made pursuant to the general Home Rule Amendment to the Colorado Constitution. A general grant of power to a local government was not a sufficiently articulated state policy that would make its actions immune to Sherman Act prohibitions. *Id. . . . The general power to make contracts is a general grant of authority similar to Home Rule authority.*

June 13, 2005, Dist. Ct. Op. at 8-9 (emphasis added). The district court went on to assert, "[h]owever, more recent decisions of the Supreme Court and the Sixth Circuit have broadened *Parker* immunity for local governments since the *City of Lafayette* and *City of Boulder* decisions." *Id.* at 9. For this proposition, the district court cited *Hallie*, 471 U.S. 34; *Omni Outdoor Advertising*, 499 U.S. 365; and *Michigan Paytel*, 287 F.3d 527.

---

[21] *See also Hertz Corp. v. NYC*, 1 F.3d 121 (2d Cir. 1994) (holding that in Sherman Act § 1 action, state-action immunity did not apply to city ordinance that prohibited basing vehicle rental fees and decisions on the renter's residence; city acted pursuant to general home-rule powers, not any specific grant of authority over vehicle rentals).

The district court provides no explanation, however, as to how these two Supreme Court decisions overruled or modified *City of Boulder*. We conclude that neither *Hallie* nor *City of Columbia* expanded *City of Boulder*'s standard for municipal/county state-action immunity so as to cover the allegedly anticompetitive conduct challenged here.

As discussed above, *Hallie* predicates municipal/county state-action immunity on whether the particular anticompetitive conduct was a foreseeable or logical result of the powers actually expressly granted to the municipality/county, and the imposition of a no-resale condition was not a foreseeable or logical result of the powers that the Legislature granted to the registers.

The district court's reliance on our decision in *Michigan Paytel* to sustain state-action immunity here is also unpersuasive. First, to the extent that a Sixth Circuit decision allegedly conflicts with a Supreme Court decision, the district court is obligated to follow the Supreme Court decision. *See, e.g., Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005).

In any event, our decision in *Michigan Paytel* is consistent with the Supreme Court decisions discussed above: *Lafayette* (1978), *City of Boulder* (1982), *Southern Motor* (1985), *Hallie* (1985), *Omni* (1991), and *Ticor* (1992). In *Michigan Paytel,* we reaffirmed the rule that "[g]rants of general or neutral authority to govern local affairs will not satisfy the 'clear articulation' component of the state action exemption from antitrust liability." 287 F.3d at 534. There, Michigan Paytel and Ameritech submitted competing bids for an exclusive contract to provide the Detroit Police Department with in-cell telephones for use by prisoners. Ameritech won the contract, and Paytel sued under the Sherman Act, contending that Ameritech and the City of Detroit had acted "to maintain Ameritech's dominance in the pay telephone service market in the Detroit metropolitan area" by entering into the exclusive contract. *Id.* The *Michigan Paytel* panel reasoned that

> [n]o Michigan statute expressly authorizes the City to execute an exclusive contract with a telephone service provider for telephone service in its prisons. However, the Home Rule City Act does grant the City the authority to bid out public contracts and to contract for the maintenance of its prisons. Under the Michigan Constitution, these provisions must be "liberally construed in the[] favor" of municipalities. We therefore conclude that the City is immune from antitrust liability because anticompetitive effects are the logical and foreseeable result of the City's broad authority under state law and the Michigan Constitution to bid out public contracts for the maintenance of City prisons. As the district court observed, "*Under the bidding process, there would be only one successful bidder. Thus, only one bidder would have the right to install and service the pay telephones.*"

*Id.* at 535-36 (emphasis added) (internal citations omitted); *see* M.C.L. § 117.3(j) (permitting city to bid out services, such as prison phone service, to "*a* private organization") (emphasis added). In other words, the Legislature expressly authorized the city of Detroit to bid out contracts for city services such as the maintenance of city jails, and it is inherent in that process that only one bidder can win the right to provide the service. In our case, by contrast, there is no bidding process, and the applicable statutory provisions do not inherently result in or contemplate an exclusive or favored position for the county registers in the provision of unofficial copies or title information.

Finally, we note that allowing these four registers to be potentially held liable for violating the Sherman Act would not thwart the purpose of the *Parker* state-action exception – respect for state sovereignty. As the Supreme Court explained in *Lafayette*,

> [T]he fact that the governmental bodies sued are cities, with substantially less than statewide jurisdiction, has significance. When cities, each of the same status under state law, are equally free to approach a policy decision in their own way, the anticompetitive restraints adopted as policy by any one of them, may express its own

preference, rather than that of the State. Therefore, in the absence of evidence that the State authorized or directed a given municipality to act as it did, the actions of a particular city hardly can be found to be . . . restraints that "the state . . . as sovereign" imposed.

435 U.S. at 414 (footnotes omitted) (quoting *Parker*, 317 U.S. at 352).

## VII.

Unlike the other four registers, the Tuscola County register is not alleged to have imposed a no-resale condition on its sale of bulk-discounted paper records or its sale of records in non-paper format. First American alleges only that the Tuscola register "refuses to provide copies of land title records at a reasonable rate or in a cost-effective medium. The only way for title insurers to purchase land title records in Tuscola County today is to make copies of all records recorded, on paper, at the much higher rate of $1.00 per page." In the context of the rest of the complaint and the other filings in this case, we take this to mean that the Tuscola register refuses to (1) make title record copies available in non-paper form, such as microfiche or digital/computer format, and (2) offer a discount for the bulk purchase of paper copies of title records. The district court correctly held that these two practices of the Tuscola County register qualify for state-action immunity from Sherman Act liability.

As noted above, the Legislature has expressly granted the registers discretion to determine the medium in which original records are reproduced. M.C.L. § 565.551(2)(a). Under *Hallie* (U.S.), *Michigan Paytel* (6th Cir.), and other precedents, the Legislature could easily foresee that a register could exercise this discretion to refuse to provide copies in non-paper form. To put it another way, the Legislature took more than merely a "neutral" stance toward the refusal to provide non-paper copies; it *expressly* authorized and endorsed that practice as the register's option. *See Southern Motor*, 105 S. Ct. at 1729 ("a state policy that *expressly permits*, but does not compel, anticompetitive conduct may be 'clearly articulated' within the meaning of *Midcal*.") (emphasis added). Thus, in refusing to make non-paper copies available, the Tuscola County register acted pursuant to a clearly articulated state policy and cannot be sued under the Sherman Act.

The Tuscola County register's alleged refusal to provide a bulk discount for paper copies presents a less obvious question, but the answer is ultimately the same. Unlike the registers' discretion to provide copies in paper or non-paper form, the Legislature has not expressly granted registers the discretion whether or not to offer a bulk discount. At first blush, then, Tuscola County's refusal to provide a bulk discount might seem to run afoul of the rule that "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the . . . actions challenged as anticompetitive." *City of Boulder*, 455 U.S. at 55.

On the other hand, the Legislature did not merely grant counties the general power to contract; it enacted statutes that address the registers' provision of title record copies in some detail. The Legislature required registers to make title records available for inspection, required them to provide certified copies of title records upon request, authorized them to provide copies in non-paper form, and specified a $1.00 per-page fee for paper copies – yet it chose not to require them to provide bulk discounts. In fact, of the many title record details addressed by the Legislature, it did not even mention the registers' discretion to offer bulk discounts, let alone specify how such discounted rates might be calculated if the registers chose to offer them. In this context, it is reasonably foreseeable that a register accorded the discretion to provide paper copies at such a hefty per-page fee would choose to reap the revenues generated by that fee rather than forgo them. Accordingly, we hold that the Tuscola register's refusal to provide a bulk discount qualifies for state-action immunity.

VIII.

For the foregoing reasons, we affirm the dismissal of the Sherman Act claims with regard to defendant Tuscola County Register of Deeds.

We reverse the dismissal of the Sherman Act claims, however, with regard to the no-resale condition imposed by defendants Registers of Deeds of Lapeer County, Saginaw County, Eaton County, and Newaygo County, and remand for further proceedings consistent with this opinion.

We hold only that the registers' practice of conditioning bulk discounts, non-paper reproduction, or reproduction of records generally, on the purchaser's agreement not to sell the official certified copies (or unofficial "copies of copies," or the information therein) to third parties, does not qualify for state-action immunity. We intimate no opinion on the merits of the Sherman Act claims. Moreover, even if the district court determines that the registers have violated the Sherman Act, that will mean only that the registers may not condition bulk discounts, non-paper reproduction, or reproduction of records generally, on the purchaser giving up his right to sell the official certified copies (or unofficial "copies of copies," or the information therein) to third parties.[22]

---

[22]Furthermore, a finding of a Sherman Act violation will *not* obligate the registers to (1) reproduce records for First American or anyone else, rather than merely providing equipment for the purchaser to reproduce the records himself; (2) offer a bulk discount to First American or anyone else for the reproduction of paper or non-paper records; or (3) make records available to First American or anyone else in non-paper format in the first place. The Legislature has expressly granted the registers discretion to determine the medium in which original title records are reproduced, i.e., paper or non-paper. M.C.L. § 565.551(2)(a). The Legislature has also expressly granted the registers discretion to fulfill a title record request *either* by reproducing the record itself *or* by providing equipment for the purchaser to do the reproduction (or, if the purchaser requests it, by letting the purchaser bring in his own equipment and doing the reproduction). M.C.L. §§ 565.551(2)(a)-(c).

The registers will still have the authority, under M.C.L. § 565.551(2)(a), to offer *non-paper* reproduction, in any of the formats prescribed by the records reproduction act, M.C.L. § 24.402, to *all* purchasers or to *no* purchasers. Nor will the district court's decision affect the registers' authority to offer bulk discounts to *all* purchasers or to *no* purchasers.